## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

| | |
|---|---|
| HYEYOUNG BYUN, derivatively on behalf of NIKOLA CORPORATION,<br><br>    Plaintiff,<br><br>    vs.<br><br><br>TREVOR MILTON, STEVE GIRSKY, STEVE SHINDLER, MARK RUSSELL, KIM J. BRADY, SOPHIA JIN, MIKE MANSUETTI, GERRIT MARX, LON STALSBERG, DEWITT THOMPSON, V, JEFF UBBEN, ROBERT GENDELMAN, SARAH W. HALLAC, RICHARD J. LYNCH, and VICTORIA MCINNIS,<br><br>    Defendants,<br><br>    and<br><br>NIKOLA CORPORATION,<br><br>    Nominal Defendant. | Case No.: |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## INTRODUCTION

Plaintiff Hyeyoung Byun ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of Nominal Defendant Nikola Corporation ("Nikola" or the "Company"), files this Verified Shareholder Derivative Complaint against Individual Defendants Trevor Milton, Steve Girsky, Steve Shindler, Mark Russell, Kim J. Brady, Sophia Jin, Mike Mansuetti, Gerrit Marx, Lon Stalsberg, DeWitt Thompson, V, Jeff Ubben, Robert Gendelman, Sarah W. Hallac, Richard J. Lynch, and Victoria McInnis (collectively, the "Individual Defendants" and together with Nikola, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of

Nikola, unjust enrichment, abuse of control, gross mismanagement, and violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"). As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Nikola, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by Nikola's current and/or former directors and officers from March 3, 2020 through the present (the "Relevant Period").

2.      Nikola purports to operate in the zero-emissions vehicle design market. The Company claims to be "an industry leading disrupter" that designs and manufactures zero-emission battery-electric and hydrogen-electric vehicles, electric vehicle drivetrains, vehicle components, energy storage systems, and hydrogen station infrastructure.

3.      The Company is the product of a reverse merger between VectoIQ Acquisition Corp. ("VectoIQ")[1] and Nikola Motor Company ("Nikola Motor"). Nikola Motor was founded in 2015 by Trevor Milton ("Milton"), a self-made billionaire entrepreneur with a history of

---

[1] References herein to the Company, Nikola, and/or VectoIQ are used interchangeably.

speculative business ventures. Prior to June 2020, Nikola Motor was privately owned and run. The Company's common stock began publicly trading on the Nasdaq Stock Market LLC ("NASDAQ") in early June 2020.

4.     During the Relevant Period, the Individual Defendants touted the prospects and ability of Nikola's business operations, maintaining, among other things, that the Company designed its components in-house, had already successfully cut the cost of producing hydrogen, and that its trucks were fully functioning revolutionary products.

5.     The truth, however, was that the Individual Defendants created and maintained an illusion of success and progress that not only fooled the investing public, but secured a partnership deal with notorious vehicle manufacturer, General Motors ("GM").

6.     On September 10, 2020, Hindenburg Research ("Hindenburg") released a scathing research report titled, "Nikola: How to Parlay an Ocean of Lies Into a Partnership With the Largest Auto OEM in America" (the "Hindenburg Report"). According to the Hindenburg Report, Hindenburg had uncovered "dozens of false statements by [Defendant Milton]" based on "extensive evidence—including recorded phone calls, text messages, private emails and behind-the-scenes photographs," and concluded that the Company "is an intricate fraud built on dozens of lies over the course of [Defendant Milton's] career."

7.     On this news, the price per share of Nikola common stock fell $10.24 per share over the next two trading days, or 24%, from closing at $42.37 per share on September 9, 2020, to close at $32.13 per share on September 11, 2020.

8.     On September 14, 2020, the Company issued a press release rejecting the claims presented in the Hindenburg Report in order to "set[] the record straight[.]" The same day,

*Bloomberg* published an article titled, "SEC Examining Nikola Over Short Seller's Fraud Allegations," disclosing that the SEC was investigating the claims made in the Hindenburg Report.

9.      The next day, on September 15, 2020, the *Wall Street Journal* published an article titled, "Justice Department Probes Electric – Truck Startup Nikola Over Claims It Misled Investors," announcing that the U.S. Department of Justice (the "DOJ") was joining the SEC in investigating Nikola over fraud allegations lodged against Nikola in the Hindenburg Report.

10.     Also on September 15, 2020, Hindenburg published a follow-up report responding to Nikola's purported retort to the Hindenburg Report titled, "We View Nikola's Response As a Tacit Admission of Securities Fraud" (the "Hindenburg Report II"). The Hindenburg Report II asserted that "Nikola Failed to Address 43 of our 53 Questions. Of Those It Touched On, It Largely Confirmed Our Findings or Raised New Questions[.]"

11.     On this news, the price per share of Nikola common stock fell another $0.17 per share over the course of the trading day, or 8.27%, from opening at $33.00 per share on September 15, 2020, to close at $32.83 per share the same day.

12.     On September 21, 2020, the Company issued a press release and filed a current report with the SEC on Form 8-K announcing the voluntary resignation of Defendant Milton from the Company and its Board.

13.     The Company's common stock fell further upon this news, from closing at $34.19 per share on September 18, 2020 to close at $27.58 per share on September 21, 2020, a drop of $6.61 per share, or nearly 20%.

14.     During the Relevant Period, the Individual Defendants breached their fiduciary duties by causing the Company to fail to maintain internal controls.

15.     Also during the Relevant Period, the Individual Defendants, in breach of their fiduciary duties owed to Nikola, willfully or recklessly made and/or caused the Company to materially misrepresent and overplay the business, operations, and prospects of Nikola. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose that: (1) the Company failed to adequately conduct due diligence prior to executing the merger with Nikola Motor; (2) the Company exaggerated and obscured the background and expertise of its primary employees; (3) the Company overstated Nikola's hydrogen production and "in-house" capabilities, such as its capacity to design, manufacture, and test its products; (4) consequently, Nikola overplayed its ability to reduce the cost of hydrogen fuel; (5) Defendant Milton, continually personally exaggerated the Company's business operations and prospects, including by tweeting deceptive video footage of Nikola's "test" run of its Nikola Two truck; (6) contrary to Defendant Milton's representations, the Company did not in fact have five Tre trucks "coming off the assembly line right now"; (7) the aforementioned misrepresentations painted a false image of the Company which artificially inflated Nikola's stock price and subjected the Company to predictably heightened regulatory scrutiny and exposure; and (8) the Company failed to maintain internal controls. As a result of the foregoing, Nikola's public statements were materially false and misleading at all relevant times.

16.     The Individual Defendants failed to correct and/or caused the Company to fail to correct these false and misleading statements and omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

17.     Furthermore, one of the Individual Defendants further breached their fiduciary duties by engaging in a lucrative insider sale, obtaining proceeds of over $59.7 million while the

price of the Company's common stock was artificially inflated due to the false and misleading statements of material fact, and before the truth was exposed.

18.     The Individual Defendants' breaches of fiduciary duty and other misconduct have subjected the Company, its Chief Executive Officer ("CEO"), its former Executive Chairman, its Chief Financial Officer ("CFO"), its former CFO, and its former CEO to a federal securities fraud class action lawsuit pending in the United States District Court for the District of Arizona, and subjected the Company, its CEO, its former Executive Chairman, and its CFO to another federal securities fraud class action lawsuit pending in the United States District Court for the Eastern District of New York (the "Securities Class Actions"), the need to undertake internal investigations, and losses due to the unjust enrichment of Individual Defendants who were improperly over-compensated by the Company, and is costing the Company millions of dollars.

19.     The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

20.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action and of three of the directors' liability in one or both of the Securities Class Actions, and of their not being disinterested and/or independent directors, a majority of the Nikola Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

21.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1) and Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9.

22.     Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Actions based on violations of the Exchange Act.

23.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

24.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

25.     Venue is proper in this District because Nikola is incorporated in this District. In addition, a substantial portion of the transactions and wrongs complained of herein occurred in this District, the Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

### Plaintiff

26.     Plaintiff is a current shareholder of Nikola. Plaintiff has continuously held Nikola common stock at all relevant times.

### Nominal Defendant Nikola

27.     Nominal Defendant Nikola f/k/a VectoIQ is a Delaware corporation headquartered at 4141 E Broadway Road, Phoenix, Arizona 85040. Nikola stock trades on NASDAQ under the ticker symbol "NKLA." Prior to June 4, 2020, the Company's stocks traded on NASDAQ under the ticker symbol "VTIQ."

**Defendant Milton**

28.     Defendant Trevor Milton ("Milton") is the founder of Nikola Motor and served as the Company's Executive Chairman from June 2020 until his voluntary departure from the Company on September 20, 2020. In connection with his resignation, Defendant Milton relinquished 100% of the 4,859,0000 performance-based stock units granted to him on August 21, 2020, and certain other entitlements pursuant to his prior employment agreement with the Company from June 2020. His separation agreement continues to grant him certain indemnification rights and other perquisites. According to the Company's current report filed with the SEC on June 8, 2020, (the "June 8, 2020 8-K"), as of June 3, 2020, Defendant Milton beneficially owned 91,602,734 shares of the Company's common stock, which represented 25.4% of the Company's outstanding stock as of that date held by M&M Residual, LLC, Defendant Milton's wholly-owned company. Given that the price per share of the Company's common stock at the close of trading on June 3, 2020 was $33.97, Defendant Milton owned approximately $3.1 billion worth of Nikola stock, excluding additional shares Defendant Milton owned through T&M Residual, LLC ("T&M"), a company owned by Defendant Milton and Mark A. Russell ("Russell"), the Company's current CEO.

29.     For the fiscal year ended December 31, 2019, Defendant Milton received $266,000 in compensation from Nikola Motor.

30.     The Company's website[2] stated the following about Defendant Milton:

> Nikola is led by its founder and serial entrepreneur, Trevor Milton. Mr. Milton oversees the day-to-day operations of the Company as its CEO. Prior to starting Nikola Motor Company, Trevor was the CEO of dHybrid Systems, LLC a natural gas storage technology company that was acquired by one of America's largest steel providers, Worthington Industries, Inc. Trevor Milton has spent the last 7 years in the class 8 truck industry, focusing on recalibration of diesel engines and emissions, then moving into storage of high pressure natural gas & hydrogen.

---

[2] https://nikolamotor.com/investors/corporate?active=leadership. Last visited September 18, 2020.

Trevor is also the author of several patents and has helped advance green technologies through his years of industry experience.

Mr. Milton holds a controlling interest in the Company and has directed research, development and prototype assembly of the Nikola portfolio. Trevor has also assisted in design of nearly every part of the Nikola One truck; rotor / stator, inverters, controllers, DC to DC, motor gearbox, thermal management, battery and ESS, infotainment and much more. Mr. Milton is a proven leader with a passion for sustainable energy projects through disruptive technologies.

Mr. Milton is fluent in English, Portuguese and is semi-fluent in Spanish having lived in Puerto Rico and Brazil. Mr. Milton has led Nikola Motor Company from startup to over 14 billion dollars in pre-order reservations for the Nikola Hydrogen Electric Truck.

**Defendant Girsky**

31.     Defendant Steven Girsky ("Girsky") previously served as the President, CEO and Director of VectoIQ from January 2018 until June 2020. He currently serves as the Chairman of the Board. He also serves as Chair of the Audit Committee and as a member of the Nominating and Corporate Governance Committee.  According to the June 8, 2020 8-K, as of June 3, 2020, Defendant Girsky beneficially owned 1,754,354 shares of the Company's common stock, which represented 0.4% of the Company's outstanding stock as of that date. Given that the price per share of the Company's common stock at the close of trading on June 3, 2020 was $33.97, Defendant Girsky owned approximately $59.6 million worth of Nikola stock.

32.     The Company's website stated the following about Defendant Girsky:

Upon the consummation of the Business Combination, Mr. Girsky will serve as a member of the New Nikola Board. Mr. Girsky served as VectoIQ's President, Chief Executive Officer and Director since January 2018. Mr. Girsky is a Managing Partner of VectoIQ, LLC, an independent advisory firm based in New York. Mr. Girsky has more than 30 years of experience working with corporate board executives, labor leaders, OEM leaders, suppliers, dealers and national policy makers. Mr. Girsky served in a number of capacities at General Motors Company (NYSE: GM) (''General Motors'') from November 2009 until July 2014, including vice chairman, having responsibility for global corporate strategy, new business development, global product planning and program management, global connected consumer/OnStar, and GM Ventures LLC, global research & development and global purchasing and supply chain. Mr. Girsky also served on General Motors' board of directors following its emergence from bankruptcy in June 2009 until June

2016. Mr. Girsky currently serves on the boards of directors of United States Steel Corporation (NYSE: X), a steel producer, and Brookfield Business Partners Limited, the general partner of Brookfield Business Partners, L.P. (NYSE: BBU; TSX BBU.UN), a private equity company. We believe Mr. Girsky is qualified to serve on the New Nikola Board based on his extensive leadership and business experience, including his experience as a director of numerous public companies, together with his background in finance and public company governance.

**Defendant Shindler**

33.     Defendant Steve Shindler ("Shindler") served as the Company's CFO from January 2018 to June 2020.

34.     The Company's proxy statement filed on Form 424B3 with the SEC pursuant to Schedule 14A of the Exchange Act on May 8, 2020 (the "May 2020 Proxy Statement"), stated the following about Defendant Shindler:

> **Steve Shindler** has served as our Chief Financial Officer since January 2018. Mr. Shindler is a Director of NII Holdings, Inc., a provider of differentiated mobile communications services for businesses and high value consumers in Latin America. Mr. Shindler served as Chief Executive Officer of NII from 2012 until August of 2017 as well as from 2000 to 2008. As Chief Executive Officer, Mr. Shindler successfully transformed NII from a start-up operation into a leading wireless provider with nearly 11.5 million subscribers. In his most recent role as Chief Executive Officer of NII, Mr. Shindler guided the company through a financial restructuring that included sales of its core businesses in Mexico, Peru, Argentina and Chile, as well as a voluntary petition seeking relief under Chapter 11 of the U.S. Bankruptcy Code in September 2014, where he continued in the Chief Executive Officer role following its emergence from bankruptcy in June 2015. Mr. Shindler joined Nextel Communications, Inc. in 1996 as Executive Vice President and Chief Financial Officer. Prior to joining Nextel, Mr. Shindler was Managing Director of Communications Finance at The Toronto Dominion Bank, one of the largest suppliers of capital to the wireless industry. Mr. Shindler is also a founding partner of RIME Communications Capital, a firm that has invested in early stage media, tech and telco companies.

**Defendant Russell**

35.     Defendant Mark A. Russell ("Russell") has served as the Company's CEO and as a Company director since June 2020. Prior to this position, he served as the President of Nikola Motor since February 2019 and as a director of Nikola Motor since July 2019. According to the

June 8, 2020 8-K, as of June 3, 2020, Defendant Russell beneficially owned 49,774,487 shares of the Company's common stock, which represented 13.5% of the Company's outstanding stock as of that date. These shares included, *inter alia*, shares held by Defendant Russell individually and shares held by T&M. Defendant Russell is the manager of T&M, a company owned by him and Defendant Milton. Given that the price per share of the Company's common stock at the close of trading on June 3, 2020 was $33.97, Defendant Russell owned approximately $1.7 billion worth of Nikola stock.

36.    For the fiscal year ended December 31, 2019, Defendant Russell received $6,558,362 in compensation from Nikola Motor. This included $250,866 in salary and $6,307,496 in option awards. Defendant Russell's employment agreement with the Company provides him with an annual base salary of $1 million and annual time-vested stock awards of not less than $6 million in value, subject to his continued employment during a specified period and performance-based stock awards consisting of 4,859,000 restricted stock units ("RSUs").

37.    The Company's website[3] states the following about Defendant Russell:

> Mr. Russell has served as Nikola's President since February 2019 and as a member Nikola's board of directors since July 2019. Prior to joining Nikola, Mr. Russell served as President and Chief Operating Officer of Worthington Industries (NYSE: WOR) from August 2012 to August 2018. Mr. Russell received a B.I.S. in integrated studies from Weber State University and a juris doctor from Brigham Young University. We believe Mr. Russell is qualified to serve on the New Nikola Board due to his extensive leadership and management experience at various public and private companies, including his experience serving as Nikola's President and Chief Operating Officer.

**<u>Defendant Brady</u>**

38.    Defendant Kim J. Brady ("Brady") has served as the Company's CFO since June 2020. Prior to serving as the Company's CFO, Defendant Brady served as Nikola Motor's CFO

---

[3] https://nikolamotor.com/investors/corporate?active=board. Last visited September 21, 2020.

and Treasurer since November 2017.  According to the June 8, 2020 8-K, as of June 3, 2020, Defendant Brady beneficially owned 10,275,414 shares of the Company's common stock, which represented 2.8% of the Company's outstanding stock as of that date. Given that the price per share of the Company's common stock at the close of trading on June 3, 2020 was $33.97, Defendant Brady owned approximately $349 million worth of Nikola stock.

39.     For the fiscal year ended December 31, 2019, Defendant Brady received $262,451 in compensation from Nikola Motor. This included $250,000 in salary and $12,451 in all other compensation. Defendant Brady's employment agreement with the Company provides him with an annual base salary of $1 million and annual time-vested stock awards of not less than $3.2 million in value, subject to his continued employment during a specified period and performance-based stock awards consisting of 2,591,000 restricted stock units ("RSUs").

40.     The Company's website[4] states the following about Defendant Brady:

> Kim Brady recently served as a Senior Managing Director with SOLIC Capital Advisors, LLC. He brings over 20 years of experience in investment banking, private equity, and corporate restructuring. During the past decade, he has consummated over four billion dollars in transactions and recapitalizations and has overseen the successful performance improvements and reorganizations in over 100 businesses. He has previously served as CFO, General Manager, and Financial Advisor for various companies in manufacturing, business services, and healthcare services.
>
> Before joining SOLIC Capital Advisors, LLC (and its predecessors, Navigant Capital Advisors, LLC and Casas, Benjamin & White, LLC), Kim served as General Manager and CFO for Doshi Diagnostic (a division of PrimeCare International), VP of Business Development, PrimeCare International, and Manager of Strategy and Planning, European Operations, with Baxter International, Inc. He currently serves on the board of SurePeople, LLC and as Executive Chairman of Ascentec Engineering, LLC. Kim received his bachelor of science degree from Marriott School of Management at Brigham Young University and his MBA from Northwestern University's Kellogg Graduate School of Management. He is FINRA Series 7 and Series 63 licensed.

---

[4] https://nikolamotor.com/investors/corporate?active=leadership. Last visited September 21, 2020.

**Defendant Jin**

41.    Defendant Sophia Jin ("Jin") has served as a Company director since June 2020 and served as a director of Nikola Motor since May 2019.  She also serves as a member of the Audit Committee.

42.    Defendant Jin did not receive compensation for her role as a director of Nikola Motor. Pursuant to the Company's non-employee director compensation program, Defendant Jin is entitled to receive an annual grant of RSUs under Nikola Corporation 2020 Stock Incentive Plan (the "2020 Plan") for shares of common stock having a grant date fair market value of $200,000 to vest in full on the first anniversary of such grant date, subject to continued service.

43.    The Company's website[5] stated the following about Defendant Jin:

Ms. Jin has been a member of Nikola's board of directors since May 2019 and a member of Nikola's audit committee since October 2019. Ms. Jin has served as senior director of venture investments of Hanwha Holdings, a stage-agnostic investor representing Hanwha

Corporation, since January 2019, and served as director of venture investment of Hanwha Holdings from January 2018 to December 2018. Prior to that, Ms. Jin held various positions at Hanwha Q CELLS America Inc., a global solar cell and module manufacturer, including director of corporate planning from July 2013 to June 2015 and director of head of marketing from July 2015 to December 2017. Ms. Jin received a bachelor's in business administration from Seoul National University and an MBA from the Stanford University Graduate School of Business.

**Defendant Mansuetti**

44.    Defendant Mike Mansuetti ("Mansuetti") has served as a Company director since June 2020 and served as a director of Nikola Motor since September 2019.  He also serves as a member of the Audit Committee.

45.    Defendant Mansuetti did not receive compensation for his role as a director of Nikola Motor. Pursuant to the Company's non-employee director compensation program,

---

[5] https://nikolamotor.com/investors/corporate?active=board. Last visited September 21, 2020.

Defendant Mansuetti is entitled to receive an annual grant of RSUs under the 2020 Plan for shares of common stock having a grant date fair market value of $200,000 to vest in full on the first anniversary of such grant date, subject to continued service.

46.    The Company's website[6] stated the following about Defendant Mansuetti:

Mr. Mansuetti has been a member of Nikola's board of directors since September 2019 and a member of Nikola's audit committee since October 2019. Since July 2012, Mr. Mansuetti has been the President of Robert Bosch LLC, an automotive component supply company. Mr. Mansuetti received a bachelor's of science in mechanical engineering from Clemson University.

**Defendant Marx**

47.    Defendant Gerrit Marx ("Marx") has served as a Company director since June 2020 and served as a director of Nikola Motor since September 2019.  He also serves as Chair of the Compensation Committee and as a member of the Nominating and Corporate Governance Committee.

48.    Defendant Marx did not receive compensation for his role as a director of Nikola Motor. Pursuant to the Company's non-employee director compensation program, Defendant Marx is entitled to receive an annual grant of RSUs under the 2020 Plan for shares of common stock having a grant date fair market value of $200,000, and an additional annual grant of RSUs with a $10,000 value for serving as a committee chair, to vest in full on the first anniversary of such grant date, subject to continued service.

49.    The Company's website[7] stated the following about Defendant Marx:

Mr. Marx has been a member of Nikola's board of directors since September 2019 and a member of Nikola's compensation committee since October 2019. Mr. Marx has served as Chief Executive Officer of Iveco, a commercial goods manufacturing company, since March 2019 and as President of commercial and specialty vehicles of CNHI (Nasdaq: CNHI), an industrial goods manufacturing company, since January 2019. Prior to joining CNHI, Mr. Marx served as an operating partner Bain

---

[6] https://nikolamotor.com/investors/corporate?active=board. Last visited September 21, 2020.
[7] https://nikolamotor.com/investors/corporate?active=board. Last visited September 21, 2020.

Capital, a global private equity firm, from December 2012 to December 2018. Mr. Marx served as interim Chief Executive Officer of Wittur Holding GmbH, an elevator component manufacturing company, from May 2017 to March 2018 and as interim President of power tools of Apex Tool Group, LLC, a hand and power tool manufacturing company, from November 2014 to April 2015. Mr. Marx received a master's of engineering equivalent in mechanical engineering and an MBA equivalent from RWTH Aachen University, Germany, and a doctorate in business administration from Cologne University, Germany.

**Defendant Stalsberg**

50.     Defendant Lon Stalsberg ("Stalsberg") has served as a Company director since June 2020 and served as a director of Nikola Motor since July 2017.  He also serves as a member of the Compensation Committee.

51.     Defendant Stalsberg did not receive compensation for his role as a director of Nikola Motor. Pursuant to the Company's non-employee director compensation program, Defendant Stalsberg is entitled to receive an annual grant of RSUs under the 2020 Plan for shares of common stock having a grant date fair market value of $200,000 to vest in full on the first anniversary of such grant date, subject to continued service.

52.     The Company's website[8] stated the following about Defendant Stalsberg:

Mr. Stalsberg has been a member of Nikola's board of directors since July 2017 and a member of Nikola's compensation committee since January 2019. Since 1980, Mr. Stalsberg has served as President and Chief Executive Officer or ACE Recycle and Disposal, Inc., a waste management company. Mr. Stalsberg received a bachelor's of science in civil engineering from Washington State University.

**Defendant Thompson**

53.     Defendant DeWitt Thompson, V ("Thompson") has served as a Company director since June 2020 and served as a director of Nikola Motor since July 2017.  He also serves as a member of the Compensation Committee.  According to the June 8, 2020 8-K, as of June 3, 2020, Defendant Thompson beneficially owned 21,593,927 shares of the Company's common stock,

---

[8] https://nikolamotor.com/investors/corporate?active=board. Last visited September 21, 2020.

which represented 6.0% of the Company's outstanding stock as of that date. Given that the price per share of the Company's common stock at the close of trading on June 3, 2020 was $33.97, Defendant Thompson owned approximately $733 million worth of Nikola stock.

54.   Defendant Thompson did not receive compensation for his role as a director of Nikola Motor. Pursuant to the Company's non-employee director compensation program, Defendant Thompson is entitled to receive an annual grant of RSUs under the 2020 Plan for shares of common stock having a grant date fair market value of $200,000 to vest in full on the first anniversary of such grant date, subject to continued service.

55.   The Company's website[9] stated the following about Defendant Thompson:

Mr. Thompson has been a member of Nikola's board of directors since July 2017 and a member of Nikola's compensation committee since December 2018.

DeWitt C. Thompson, V, is Chairman and Chief Executive Officer of Thompson Machinery Commerce Corporation, a Caterpillar distributor in Tennessee and Mississippi, servicing heavy machinery, on-highway trucks, and power systems. He also serves as Chairman for Aries Clean Energy. Thompson founded PureSafety in 1999 and served as Chairman until the purchase of that company by Underwriters Laboratories in 2011. Thompson is also an owner and director of the Nashville Predators and sits on the board of directors for Wealth Access and Shaw (global leader in pipe fabrication). He received his bachelor's of science degree from the engineering school at Vanderbilt University.

**Defendant Ubben**

56.   Defendant Jeff Ubben ("Ubben") has served as a Company director since June 2020 and served as a director of Nikola Motor since September 2019.  He also serves as Chair of the Nominating and Corporate Governance Committee.  According to the June 8, 2020 8-K, as of June 3, 2020, Defendant Ubben beneficially owned 20,362,024 shares of the Company's common stock, which represented 5.6% of the Company's outstanding stock as of that date. Given that the price

---

[9] https://nikolamotor.com/investors/corporate?active=board. Last visited September 21, 2020.

per share of the Company's common stock at the close of trading on June 3, 2020 was $33.97, Defendant Ubben owned approximately $691 million worth of Nikola stock.

57.     Defendant Ubben did not receive compensation for his role as a director of Nikola Motor. Pursuant to the Company's non-employee director compensation program, Defendant Ubben is entitled to receive an annual grant of RSUs under the 2020 Plan for shares of common stock having a grant date fair market value of $200,000, and an additional annual grant of RSUs with a $10,000 value for serving as a committee chair, to vest in full on the first anniversary of such grant date, subject to continued service.

58.     During the Relevant Period, when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Ubben made the following sale of Company stock:

| Date | Number of Shares | Price Per Share | Proceeds |
|---|---|---|---|
| August 11, 2020 | 1,400,000 | $42.69 | $59,766,000 |

59.     His lucrative insider sale, made with knowledge of material non-public information before the material misstatements and omissions were exposed, demonstrates his motive in facilitating and participating in the scheme.

60.     The Company's website[10] stated the following about Defendant Ubben:

Mr. Ubben has been a member of Nikola's board of directors since September 2019 and a member of Nikola's audit committee since October 2019. In 2000, Mr. Ubben founded ValueAct Capital Management, L.P., a financial services company, where he served as chairman. Mr. Ubben has served as a member of the boards of directors of numerous public and private companies, including The AES Corporation (NYSE: AES), an electrical power distribution company, since January 2018, Twenty-First Century Fox, Inc. (Nasdaq: TFCF and TFCFA), a multinational mass media corporation which was acquired by Walt Disney Co (NSYE: DIS) in March 2019, from November 2015 to April 2018, Willis Towers Watson plc (NYSE: WSH), a multinational risk management, insurance brokerage and advisory company (''Willis Towers''), from January 2016 to November 2017, Willis Group

---

[10] https://nikolamotor.com/investors/corporate?active=board. Last visited September 21, 2020.

Holding plc, a subsidiary of Willis Towers, from July 2013 to January 2016 and Bausch Health Companies Inc. (NYSE: BHC), a pharmaceutical company, from October 2014 to August 2015. Mr. Ubben has a B.A. in economics and political science from Duke University and an MBA from the Kellogg School of Management at Northwestern University.

**Defendant Gendelman**

61.     Defendant Robert Gendelman ("Gendelman") served as a Company director from May 2018 until June 2020.  He also served as a member of the Audit Committee.

62.     The Company's annual report filed on March 6, 2020 with the SEC on Form 10-K for the fiscal year ended December 31, 2019 (the "2019 10-K") stated the following about Defendant Gendelman:

> **Robert Gendelman** has served as a director since the completion of the initial public offering. Mr. Gendelman has served as Senior Portfolio Manager and head of Equity Investments at Loews Corporation, a diversified holding company since January 2013. Prior to joining Loews Corporation, Mr. Gendelman was Chief Investment Officer for RG Advisors, and prior to that was Managing Director at Clearbridge Advisors, where he managed assets for Legg Mason Partners Capital & Income Fund. He also spent approximately 10 years as a portfolio manager at Neuberger Berman. We believe Mr. Gendelman is well qualified to serve on our Board of Directors based on his extensive experience in the financial services industry and evaluating investments.

**Defendant Hallac**

63.     Defendant Sarah W. Hallac ("Hallac") served as a Company director from May 2018 until June 2020.  She also served as a member of the Audit Committee and Compensation Committee.

64.     The Company's 2019 10-K stated the following about Defendant Hallac:

**Sarah W. Hallac** has served as a director since the completion of the initial public offering. Ms. Hallac has served as a consultant for a corporate philanthropic initiative by BlackRock, Inc., an investment management corporation. Ms. Hallac is a retired investment banker from Bear, Stearns and Company, where she spent her entire career in the Financial Analytics and Structured Transactions group. Ms. Hallac was involved in the early days of mortgage securitization including the first Agency Real Estate Mortgage Investment Conduit (REMIC) issued by the Federal

National Mortgage Association (FNMA). Ms. Hallac has been published in several books, including The Handbook of Mortgage-Backed Securities. We believe Ms. Hallac is well qualified to serve on our Board of Directors based on her extensive experience in investment banking and evaluating investments.

**Defendant Lynch**

65.     Defendant Richard J. Lynch ("Lynch") served as a Company director from May 2018 until June 2020.  He also served as a member of the Compensation Committee.

66.     The Company's 2019 10-K stated the following about Defendant Lynch:

**Richard J. Lynch** has served as a director since the completion of the initial public offering. Mr. Lynch has served as President of FB Associates, LLC, a consulting firm that specializes in the telecommunications industry, since October 2011. Prior to that, Mr. Lynch held the positions of Executive Vice President and Chief Technology Officer with Verizon Communications and with Verizon Wireless and its predecessors. Mr. Lynch currently serves as Chairman of the Board of Ribbon Communications Inc. (Nasdaq: RBBN) and a director of Blackberry Limited (NYSE: BB). We believe Mr. Lynch is well qualified to serve on our Board of Directors based on his extensive leadership experience in the technology industry and serving on the Boards of public companies.

**Defendant McInnis**

67.     Defendant Victoria McInnis ("McInnis") served as a Company director from May 2018 until June 2020.  She also served as chairman of the Audit Committee.

68.     The Company's 2019 10-K stated the following about Defendant McInnis:

**Victoria McInnis** has served as a director since the completion of the initial public offering. Ms. McInnis held various positions with General Motors Corporation prior to her retirement in August 2017, including Vice President, Tax and Audit March 2015 to August 2017, Chief Tax Officer from 2009 to March 2015 and, prior to that, Executive Director, Tax Counsel, General Tax Director, Europe, Director of Federal Tax Audits, and Senior Tax Counsel, GM Canada. We believe Ms. McInnis is well qualified to serve on our Board of Directors based on her extensive experience in the automotive industry and her financial expertise.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

69.     By reason of their positions as officers and/or directors of Nikola and because of their ability to control the business and corporate affairs of Nikola, the Individual Defendants owed

Nikola and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Nikola in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Nikola and its shareholders so as to benefit all shareholders equally.

70.     Each director and officer of the Company owes to Nikola and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

71.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Nikola, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

72.     To discharge their duties, the officers and directors of Nikola were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

73.     Each Individual Defendant, by virtue of his or her position as a director and/or officer owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and/or officers of Nikola, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and/or directors of the

Company has been ratified by the remaining Individual Defendants who collectively comprised Nikola's Board at all relevant times.

74.     As senior executive officers and/or directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.

75.     To discharge their duties, the officers and directors of Nikola were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Nikola were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, Arizona, and the United States, and pursuant to Nikola's own Code of Business Conduct and Ethics;

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)  remain informed as to how Nikola conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)  establish and maintain systematic and accurate records and reports of the business and internal affairs of Nikola and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)  maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Nikola's operations would comply with all applicable laws and Nikola's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)  exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)  refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)  examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

76.  Each of the Individual Defendants further owed to Nikola and the shareholders the duty of loyalty requiring that each favor Nikola's interest and that of its shareholders over their

own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

77.     At all times relevant hereto, the Individual Defendants were the agents of each other and of Nikola and were at all times acting within the course and scope of such agency.

78.     Because of their advisory, executive, managerial, and directorial positions with Nikola, each of the Individual Defendants had access to adverse, non-public information about the Company.

79.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Nikola.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

80.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

81.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, and violations of Section 14(a) of the Exchange Act.

82.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and

individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of Nikola was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

83.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

84.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Nikola, and was at all times acting within the course and scope of such agency.

## NIKOLA'S CODE OF CONDUCT

85.     The Company's Code of Business Conduct and Ethics (the "Code of Conduct"), provides that "all of the employees of the Company are subject to the following additional specific policies contained in this Code."

86.     The Code of Conduct provides, as to Nikola's "Compliance with Law, Rules and Regulations," that:

> Company policy requires that our business activities comply with both the letter and the spirit of all applicable laws, rules and regulations. Although not all employees are expected to know the details of these laws, it is important to know enough to determine when to seek advice from supervisors, managers or other appropriate personnel.

87.     The Code of Conduct provides, as to "Conflicts of Interest," that:

A "conflict of interest" arises when a person's loyalties or actions are divided between the interests of the Company and those of another, such as a competitor, supplier or customer, or personal business. A conflict of interest can arise when an employee takes actions or has interests that may make it difficult to perform his or her work for the Company objectively and effectively. A conflict of interest may also arise when an individual, or a member of his or her family, receives an improper personal benefit as a result of his or her position in, or relationship with, the Company. Breach of confidentiality obligations can also give rise to a conflict of interest. Moreover, the appearance of a conflict of interest alone can adversely affect the Company and its relations with customers, suppliers and employees.

Employees are expected to use good judgment, to adhere to high ethical standards and to avoid situations that create an actual or potential conflict of interest. It is almost always a conflict of interest for employees to work simultaneously for a competitor, customer or supplier.

A conflict of interest can also arise with respect to employment of relatives and persons with close personal relationships. If an employee or someone with whom an employee has a close relationship (e.g., a family member or close companion) has a financial or employment relationship with an actual or potential competitor, supplier or customer, the employee must disclose this fact in writing to the Chief Financial Officer of the Company.

88.     The Code of Conduct provides, as to "Fair Dealing," that:

Although the prosperity of our Company depends on our ability to outperform our competitors, the Company is committed to achieving success by fair and ethical means. We seek to maintain a reputation for honesty and fair dealing among our competitors and the public alike. In light of this aim, dishonest, unethical or illegal business practices are prohibited, including, without limitation, corruption, bribery, kickbacks, extortion, embezzlement, or other similar practices. An exhaustive list of unethical practices cannot be provided. Instead, the Company relies on the judgment of each individual to avoid such practices. Furthermore, each employee should endeavor to deal fairly with the Company's customers, suppliers, competitors and employees. No employee should take unfair advantage of anyone through manipulation, concealment, abuse of privileged information, misrepresentation of material facts, or any other unfair business practice.

89.     The Code of Conduct states, as to "Insider Trading," that:

You are not permitted to use, share or disseminate confidential information for stock trading purposes or for any other purpose except the conduct of our business. To use confidential information for personal financial benefit or to "tip" others who might make an investment decision on the basis of this information is not only unethical, but is also illegal. You are expected to comply with the Company's Insider Trading Policy.

90.     The Code of Conduct states that "[t]he Company requires honest and accurate recording and reporting of information in order to make responsible business decisions[,]" stating:

> If you use a business expense account, expenses to be reimbursed must be documented and recorded accurately. If you are not sure whether an expense is appropriate, ask your supervisor. All of the Company's books, records, accounts and financial statements must be maintained in reasonable detail, must appropriately reflect the Company's transactions and must conform both to applicable legal requirements and to the Company's system of internal controls. All Company business data, records and reports must be prepared truthfully and accurately. The Company's business records must be maintained for the periods specified in the Company's applicable record retention policies.
>
> Employees who contribute to or prepare the Company's financial statements, public filings, submissions or communications should do so in accordance with the following guidelines:
>
> • All accounting records, as well as reports produced from those records, must be prepared in accordance with the laws of each applicable jurisdiction.
>
> • All records must fairly and accurately reflect the transactions or occurrences to which they relate.
>
> • All records must fairly and accurately reflect, in reasonable detail, the Company's assets, liabilities, revenues and expenses.
>
> • The Company's accounting records must not contain any false or intentionally misleading entries.
>
> • No transactions should be intentionally misclassified as to accounts, departments or accounting periods.
>
> • All transactions must be supported by accurate documentation in reasonable detail and recorded in the proper account and in the proper accounting period.
>
> • No information should be concealed from independent auditors.
>
> • Compliance with the Company's system of internal accounting controls is required.
>
> Business records and communications often become public, and employees should avoid exaggeration, derogatory remarks, guesswork or inappropriate

characterizations of people and companies that can be misunderstood. This applies equally to e-mail, internal memos and formal reports.

91.     With respect to reporting suspected violations of the Code of Conduct, the Code of

Conduct maintained that:

> Employees are responsible for being aware of the corporate policies applicable to their activities and to comply with them fully. If you become aware of illegal activity, unethical behavior, a violation of this Code or believe that a violation may take place in the future, you must promptly report the matter. Failure to report a known violation allows misconduct to go unremedied and is itself grounds for discipline.

92.     The Code of Conduct further stated, in a section titled, "Accountability for

Adherence to this Code," that:

> The Board of Directors shall determine, or designate appropriate persons to determine, appropriate actions to be taken in the event of violations of this Code. Such actions shall be reasonably designed to deter wrongdoing and to promote accountability for adherence to this Code, and shall include written notices to the individual involved that the Board of Directors or its designee has determined that there has been a violation, and may include censure by the Board of Directors or its designee, demotion or re-assignment of the individual involved, suspension with or without pay (as determined by the Board of Directors or its designee) and termination of the individual's employment or other service.

93.     In violation of the Code of Conduct, the Individual Defendants conducted little, if

any, oversight of the Company's engagement in the Individual Defendants' scheme to issue

materially false and misleading statements to the public and to facilitate and disguise the Individual

Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of

control, gross mismanagement, and violations of Section 14(a) of the Exchange Act.  Also in

violation of the Code of Conduct, the Individual Defendants failed to maintain the accuracy of

Company records and reports, comply with laws and regulations, conduct business in an honest

and ethical manner, and properly report violations of the Code of Conduct.

## **INDIVIDUAL DEFENDANTS' MISCONDUCT**

### **Background**

94.     Nikola purports to operate in the zero-emissions vehicle design market. The Company claims to be "an industry leading disrupter" that designs and manufactures zero-emission battery-electric and hydrogen-electric vehicles, electric vehicle drivetrains, vehicle components, energy storage systems, and hydrogen station infrastructure.

95.     Nikola Motor was founded in 2015 by Defendant Milton, a self-made billionaire entrepreneur with a history of speculative business ventures. Among these business ventures was a company Defendant Milton launched in 2009 called dHybrid, Inc., which became embroiled in lawsuits and allegations of fraud for years, during which time Defendant Milton created a similar company (dHybrid Systems) and sold it to Worthington Industries. Defendant Milton claimed early on that Nikola Motor, then known as Bluegentech, had proprietary turbine technology—although it did not. In December 2015, Worthington Industries wrote off the value of dHybrid Systems as an impairment after identifying significant problems with it. Around 2016, Nikola Motor began operating in the transportation market.

96.     Prior to June 2020, Nikola Motor was privately owned and run. On June 3, 2020, VectoIQ and Nikola Motor completed a reverse merger. The Company's common stock continued publicly trading on NASDAQ on June 4, 2020, under its new name, with its new leadership, and new ticket symbol (NKLA).

**False and Misleading Statements**

***March 3, 2020 Press Release and Investor Presentation***

97.     On March 3, 2020, the Company issued a press release, attached as an exhibit to a current report filed with the SEC on Form 8-K the same day. The press release, titled "Nikola Corporation, a Global Leader in Zero Emissions Transportation Solutions, to Be Listed on

NASDAQ Through a Merger With VectoIQ," announced the impending partnership between Nikola Motor and VectoIQ and quoted Defendants Milton and Girsky, who touted:

> Trevor Milton, Founder and CEO of Nikola stated: ***"We are on a roll. You couldn't ask for better news for the energy and tech industry.*** The world is transitioning to zero emission platforms and Nikola is the leader for heavy duty vehicles. We believe we have a differentiated business model built on economics, not government subsidies. We now need to double down and speed up the timelines and get to market. We couldn't be happier to have Steve Girsky join our board."

> ***"In our two-year quest to find a partner that was a proven technology leader*** and focused on making a global difference, Nikola was the clear winner," said Stephen Girsky, CEO of VectoIQ and former Vice Chairman of General Motors Corporation. "Nikola's vision of a zero-emission future and ***ability to execute were key drivers in our decision."***

(Emphasis added.)

98.     The Form 8-K also attached an investor presentation as an exhibit. The investor presentation contained the slide below, boasting of Defendant Milton's history working in the natural gas storage and technology industry:



99. The investor presentation also included the slide below, touting the Company's ability to produce and store hydrogen:



*March 6, 2020 Form 10-K*

100. On March 6, 2020, the Company filed the 2019 10-K with the SEC. The 2019 10-K was signed by Defendants Girsky, Shindler, Gendelman, Hallac, Lynch, and McInnis, and contained certifications pursuant to Rule 13a-14(a) and 15d-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Girsky and Shindler attesting to the accuracy of the 2019 10-K.

101. The 2019 10-K described the Company's due diligence and acquisition strategy in a section titled, "Business Combination Criteria":

> Consistent with our strategy, we have identified the following general criteria and guidelines that we believe are important in evaluating prospective target businesses and, in evaluating a prospective target business, ***we expect to conduct a thorough due diligence review that will encompass, among other things, meetings with incumbent management and employees, document reviews and inspection of facilities, as applicable, as well as a review of financial and other information that will be made available to us.*** We intend to use these criteria and guidelines in evaluating acquisition opportunities, but we may decide to enter into our initial

business combination with a target business that does not meet these criteria or guidelines.

- Focus on industrial technology, transportation and smart mobility business positioned to benefit from our management team's extensive experience and contacts in these sectors. We believe our strategy leverages our management team's distinctive background and vast network of industry leaders in the target industry.

- Emphasis on companies that can benefit from a public listing and access to the public capital markets. We will primarily seek a target that we believe will benefit from being publicly traded and will be able to effectively utilize the broader access to capital and the public profile that are associated with being a publicly traded company.

- *We will target businesses that are market leaders, with established technologies* and attractive financial metrics and/or prospects, where we believe that our industry expertise and relationships can be used to create opportunities for value creation, whether for acquisitions, capital investments in organic growth opportunities or in generating greater operating efficiencies. While this may include business with a history of revenue growth and profitability, we may also target businesses that are underperforming that that we believe can benefit from our expertise and/or technology.

- *We intend to seek target businesses that have established management teams*, but that we believe could benefit from the industry experience and contacts of our management. . . .

These criteria are not intended to be exhaustive. Any evaluation relating to the merits of a particular initial business combination may be based, to the extent relevant, on these general guidelines as well as other considerations, factors and criteria that our management team may deem relevant. *In the event that we decide to enter into our initial business combination with a target business that does not meet the above criteria and guidelines, we will disclose that the target business does not meet the above criteria in our stockholder communications related to our initial business combination, which, would be in the form of proxy solicitation materials or tender offer documents that we would file with the SEC.*

(Emphasis added.)

102.    The 2019 10-K also outlined the factors the Company would consider when selecting a target business for a business combination. Specifically, in a section titled, "Selection of a Target Business and Structuring of a Business Combination," the 2019 10-K stated:

In evaluating a prospective target business, our management may consider a variety of factors, including one or more of the following:

- *financial condition and results of operation*;
- growth potential;
- brand recognition and potential;
- *experience and skill of management* and availability of additional personnel;
- capital requirements;
- competitive position;
- barriers to entry;
- stage of development of the products, processes or services;
- existing distribution and potential for expansion;
- *degree of current or potential market acceptance of the products, processes or services*;
- *proprietary aspects of products and the extent of intellectual property or other protection for products or formulas*;
- impact of regulation on the business;
- regulatory environment of the industry;
- costs associated with effecting the business combination;
- *industry leadership, sustainability of market share and attractiveness of market industries in which a target business participates*; and macro competitive dynamics in the industry within which the company competes.

These criteria are not intended to be exhaustive. Any evaluation relating to the merits of a particular business combination will be based, to the extent relevant, on the above factors as well as other considerations deemed relevant by our management in effecting a business combination consistent with our business objective. In evaluating a prospective target business, we will conduct an extensive due diligence review which will encompass, among other things, meetings with incumbent management and inspection of facilities, as well as review of financial and other information which is made available to us. This due diligence review will be conducted either by our management or by unaffiliated third parties we may engage, although we have no current intention to engage any such third parties.

(Emphasis added.)

***March 13, 2020 Prospectus***

103.   On   March   13,   2020,   the   Company   filed   a   registration statement/prospectus/preliminary proxy statement on Form S-4 with the SEC (the "March 2020 Prospectus") signed by Defendants Girsky and Milton. The March 2020 Prospectus provided further information on the process the Company undertook when approving the business combination with Nikola Motor, stating in relevant part:

As described under "*The Background of the Business Combination*" above, VectoIQ's board of directors, in evaluating the Business Combination, consulted with VectoIQ's management and financial and legal advisors. In reaching its unanimous decision to approve the Business Combination Agreement and the transactions contemplated by the Business Combination Agreement, VectoIQ's board of directors considered a range of factors, including, but not limited to, the factors discussed below. In light of the number and wide variety of factors considered in connection with its evaluation of the combination, VectoIQ's board of directors did not consider it practicable to, and did not attempt to, quantify or otherwise assign relative weights to the specific factors that it considered in reaching its determination and supporting its decision. VectoIQ's board of directors viewed its decision as being based on all of the information available and the factors presented to and considered by it. In addition, individual directors may have given different weight to different factors.

104.    The Company filed amendments and revisions to the March 2020 Prospectus on April 15, 2020, May 1, 2020, and May 5, 2020 on Forms S-4/A.

*April 20, 2020 Proxy Statement*

105.    On April 20, 2020, the Company filed a Schedule 14A with the SEC (the "April 2020 Proxy Statement").  Defendants Girsky, Gendelman, Hallac, Lynch, and McInnis solicited the April 20, 2020 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.[11]  The April 20, 2020 Proxy Statement sought to extend the date by which the business combination with Nikola Motor would be consummated in order to obtain stockholder approval of the transaction with Nikola Motor.

106.    The April 2020 Proxy Statement failed to disclose that: (1) the Company failed to adequately conduct due diligence prior to agreeing to merge with Nikola Motor; (2) the Company exaggerated and obscured the background and expertise of its primary employees; (3) the Company overstated Nikola's hydrogen production and "in-house" capabilities, such as its

[11] Plaintiff's allegations with respect to the misleading statements in the April 2020 Proxy Statement are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of certain of the Individual Defendants, and they do not allege, and do not sound in, fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

33

capacity to design, manufacture, and test its products; (4) consequently, Nikola overplayed its ability to reduce the cost of hydrogen fuel; and (5) the Company failed to maintain internal controls.

### May 8, 2020 Proxy Statement

107.    On May 8, 2020, the Company filed the May 2020 Proxy Statement with the SEC. Defendants Defendants Girsky, Gendelman, Hallac, Lynch, and McInnis solicited the April 20, 2020 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.[12]

108.    The May 2020 Proxy Statement stated, regarding the Company's Code of Conduct, that:

> The New Nikola Board will adopt a Code of Business Conduct and Ethics, or the Code of Conduct, applicable to all of New Nikola's employees, executive officers and directors. The Code of Conduct will be available on New Nikola's website at *www.nikolamotor.com*. Information contained on or accessible through New Nikola's website is not a part of this proxy statement/prospectus/information statement, and the inclusion of New Nikola's website address in this proxy statement/prospectus/information statement is an inactive textual reference only. The nominating and corporate governance committee of the New Nikola Board will be responsible for overseeing the Code of Conduct and must approve any waivers of the Code of Conduct for employees, executive officers and directors. New Nikola expects that any amendments to the Code of Conduct, or any waivers of its requirements, will be disclosed on its website.

109.    The May 2020 Proxy Statement was false and misleading because, despite assertions to the contrary, its Code of Conduct was not followed, as the Individual Defendants allowed false and misleading statements to be issued to the investing public.

---

[12] Plaintiff's allegations with respect to the misleading statements in the May 2020 Proxy Statement are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of certain of the Individual Defendants, and they do not allege, and do not sound in, fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

110.    The May 2020 Proxy Statement also described the reasons for the VectoIQ former

Board's reasons for approving the business combination, stating in relevant part:

> As described under "*The Background of the Business Combination*" above, VectoIQ's board of directors, in evaluating the Business Combination, consulted with VectoIQ's management and financial and legal advisors. In reaching its unanimous decision to approve the Business Combination Agreement and the transactions contemplated by the Business Combination Agreement, VectoIQ's board of directors considered a range of factors, including, but not limited to, the factors discussed below. In light of the number and wide variety of factors considered in connection with its evaluation of the combination, VectoIQ's board of directors did not consider it practicable to, and did not attempt to, quantify or otherwise assign relative weights to the specific factors that it considered in reaching its determination and supporting its decision. VectoIQ's board of directors viewed its decision as being based on all of the information available and the factors presented to and considered by it. In addition, individual directors may have given different weight to different factors.

> This explanation of VectoIQ's reasons for the combination and all other information presented in this section is forward-looking in nature and, therefore, should be read in light of the factors discussed under the section titled "*Cautionary Note Regarding Forward-Looking Statements*."

> In approving the combination, VectoIQ's board of directors determined not to obtain a fairness opinion. The officers and directors of VectoIQ have substantial experience in evaluating the operating and financial merits of companies from a wide range of industries and concluded that their experience and background, together with experience and sector expertise of Cowen, enabled them to make the necessary analyses and determinations regarding the Business Combination.

111.    The May 2020 Proxy Statement further outlined the factors taken into consideration

supporting the Company's former Board's decision to support the business combination, stating

in relevant part:

> VectoIQ's board of directors considered a number of factors pertaining to the Business Combination as generally supporting its decision to enter into the Business Combination Agreement and the transactions contemplated thereby, including, but not limited to, the following:

> - ***Highly Disruptive Technology. VectoIQ's management and board of directors believe that Nikola is a market disruptor*** in an attractive and growing industry with over 70 patents issued or pending and strong growth

prospects within the hydrogen fuel, BEV and FCEV sectors as well as adjacent markets;

- *Strategic Partnerships.* VectoIQ's management and board of directors considered Nikola's strategic partnerships with industry leaders, which it believes reduce Nikola's technology and execution risk from truck and hydrogen station development to truck sales and maintenance;

- *High Demand for Product.* VectoIQ's management and board of directors considered the fact that Nikola has a high volume of fuel cell electric vehicle pre-orders, currently at over $10 billion, as well as contracts with top tier customers with investment-grade credit ratings;

- *Platform Supports Further Growth Initiatives.* VectoIQ's management and board of directors believe that Nikola's business model uniquely supplies both the truck and hydrogen fueling infrastructure, solving the fleets' concerns as to where to refuel with green hydrogen at competitive pricing to diesel;

- ***Due Diligence. VectoIQ's management and board of directors conducted due diligence examinations of Nikola and discussions with Nikola's management and VectoIQ's financial and legal advisors concerning VectoIQ's due diligence examination of Nikola;***

- *Financial Condition.* VectoIQ's board of directors also considered factors such as Nikola's outlook, financial plan and debt structure, as well as valuations and trading of publicly traded companies and valuations of precedent combination and combination targets in similar and adjacent sectors (see "—*Certain Nikola Projected Financial Information*");

- *Attractive Market Valuation of Comparable Companies.* The public trading market valuation of comparable "future transportation" companies (consisting of NIO, Tesla and Virgin Galactic, which we refer to collectively as the "Comparable Future Transportation Companies") have expected 2020 enterprise value/revenue multiples and enterprise value/EBITDA multiples (in each case based on market data as of February 28, 2020) ranging from 3.3x to 650+x (and a median of 4.0x) and up to 29.5x, respectively. The public trading market valuation of comparable fuel cell technology companies (consisting of Ballard, Bloom Energy, Nel and Plug Power, which we refer to collectively as the "Comparable Fuel Cell Technology Companies") have expected 2020 enterprise value/revenue multiples and enterprise value/EBITDA multiples (in each case based on market data as of February 28, 2020) ranging from 1.7x to 14.7x (and a median of 9.5x) and up to 77.3x (and a median of 47.8x), respectively. The public trading market valuation of comparable commercial vehicle companies (consisting of Navistar, Paccar, Traton and Volvo which we refer to collectively as the "Comparable Commercial

Vehicle Companies") have expected 2020 enterprise value/revenue multiples and enterprise value/EBITDA multiples (in each case based on market data as of February 28, 2020) ranging from 0.3x to 0.8x (and a median of 0.7x) and ranging from 3.1x to 8.4x (and a median of 6.5x), respectively. The VectoIQ board of directors believes that these multiples compare favorably to an initial market valuation of the post-Business Combination company reflected in the terms of the Business Combination corresponding to projected enterprise value/revenue multiples of 11.1x, 2.4x, 1.0x and 0.6x in 2022, 2023, 2024 and 2025, respectively, and projected enterprise value/EBITDA multiples of 15.6x and 5.0x in 2024 and 2025, respectively. While Nikola's projected performance metrics used to derive the initial market valuation multiples of the post-Business Combination company reflected in the terms of the Business Combination are based on forecast periods two to five years beyond the comparable peer metrics, the VectoIQ board of directors believes that the implied valuation discount is such that even applying conservative discount rate assumptions to arrive at a present value for the post-Business Combination company results in a favorable comparison. For example, when applying the median 2020 enterprise value/revenue multiple for the Comparable Fuel Cell Technology Companies of 9.5x to Nikola's 2024 projected revenue, the initial market valuation of the post-Business Combination company implies a 67.6% annual discount rate from December 31, 2024 to June 30, 2020. Since Nikola's business is not expected to achieve scale until 2024, the VectoIQ board of directors believes this present value methodology is the most reasonable method of comparison. Although this analysis is based on the current Nikola projections, the valuation multiples decline each year as a result of the high growth projected for Nikola's business;

- ***Experienced and Proven Management Team.*** **VectoIQ's management and board of directors believe that Nikola has a strong management team which is expected to remain with the combined company to seek to execute Nikola's strategic and growth goals;**

(Emphasis added.)

112.    Further, the May 2020 Proxy Statement described the Company's due diligence and Nikola's purported ability to produce hydrogen as follows:

**Q.    Who is Nikola?**

A.    Nikola is a vertically integrated zero-emissions transportation solution provider that designs and manufactures state-of-the-art battery-electric and hydrogen fuel cell electric vehicles, electric vehicle drivetrains, energy storage systems, and hydrogen fueling stations. Nikola's core product offering is centered around its battery-electric vehicle ("BEV") and hydrogen fuel cell electric vehicle ("FCEV") Class 8 semi-trucks. The key

differentiator of Nikola's business model is its planned network of hydrogen fueling stations. Nikola is offering a revolutionary bundled lease model, which provides customers with the FCEV truck, hydrogen fuel, and maintenance for a fixed price per mile, locks in fuel demand and significantly de-risks infrastructure development. See "*Information About Nikola.*"

\* \* \*

During the week of November 25, 2019, members of the management teams from both companies met at Nikola's' headquarters in Phoenix, Arizona to enable VectoIQ's management to learn more about Nikola's current and planned business. Throughout the week the management teams also held calls to discuss scheduling for continued due diligence meetings as well as a timeline for a potential combination. During this period, VectoIQ assembled a number of industry experts to advise with respect to vehicle development, electrification, fuel cells, software, connectivity and manufacturing in connection with its due diligence efforts.

During the week of December 2, 2019, representatives of VectoIQ and Nikola held a technical due diligence call and VectoIQ had discussions with industry experts on commercial conditions in the Class 8 Hydrogen and Electrification markets.

\* \* \*

*First Test Station Installed at Nikola's Phoenix HQ*

Through our partnership with Nel ASA, a Norwegian hydrogen company ("Nel"), we have initiated the development of the hydrogen station infrastructure by completing our first 1,000 kg demo station in the first quarter of 2019 at our corporate headquarters in Phoenix, Arizona. The demo hydrogen station offers hydrogen storage and dispensing and serves as a model for future hydrogen stations.

113.    The May 2020 Proxy Statement described the Company's business as follows:

*1. DESCRIPTION OF BUSINESS AND BASIS OF PRESENTATION*

Nikola Corporation ("Nikola" or the "Company") is a designer and manufacturer of battery-electric and hydrogen-electric vehicles, electric vehicle drivetrains, vehicle components, energy storage systems, and hydrogen stations.

**The Company is also developing a network of hydrogen fueling stations to meet hydrogen fuel demand for its customers.** Fueling related activities will be conducted through the Company's wholly-owned subsidiary, Nikola Energy.

(Emphasis added.)

38

114.   The May 2020 Proxy Statement additionally touted the Company's "in-house" capabilities and Defendant Milton's purported value and expertise—and the risks faced thereby, stating in relevant part:

> In June 2019, Nikola moved into our state-of-the-art headquarters and R&D facility in Phoenix, Arizona, which consists of more than 150,000 square feet and *where we are capable of designing, building, and testing prototype vehicles in-house*.
>
>           \* \* \*
>
> *We are highly dependent on the services of Trevor R. Milton, our Chief Executive Officer.*
>
> We are highly dependent on the services of Trevor R. Milton, Chief Executive Officer, and largest stockholder. Mr. Milton is the source of many, if not most, of the ideas and execution driving Nikola. If Mr. Milton were to discontinue his service to us due to death, disability or any other reason, we would be significantly disadvantaged.

(Emphasis added.)

115.   The May 2020 Proxy Statement failed to disclose that: (1) the Company failed to adequately conduct due diligence prior to agreeing to merge with Nikola Motor; (2) the Company exaggerated and obscured the background and expertise of its primary employees; (3) the Company overstated Nikola's hydrogen production and "in-house" capabilities, such as its capacity to design, manufacture, and test its products; (4) consequently, Nikola overplayed its ability to reduce the cost of hydrogen fuel; and (5) the Company failed to maintain internal controls.

### May 15, 2020 Tweet

116.   On May 15, 2020, Defendant Milton published a tweet describing the products, technology and ability of Nikola Motor, stating:

> I laugh when articles say Nikola is all talk. 300+ mile battery and 500+ mile fuel cell to be produced by @nikolamoto& @IVECO. *These are real. Our tech is years ahead.* Production starts next year & Factory being prepped now in Germany. Watch while others follow the boss. [Emoji and images

omitted.][13]

(Emphasis added.)

### June 3, 2020 Press Release

117.    On June 3, 2020, the Company issued a press release announcing the closing of the

business combination between VectoIQ and Nikola Motor, stating in relevant part:

> The business combination, which was approved on June 2, 2020 by VectoIQ
> stockholders, further solidifies Nikola as a global leader in zero-emissions
> transportation and infrastructure solutions. On June 4, 2020, the combined
> company's shares will trade on the Nasdaq under the new ticker symbol "NKLA."
>
> * * *
>
> "Nikola is thrilled to complete the Nasdaq listing and be part of the ESG investment
> world. This is a significant endorsement in fuel-cell and battery-electric technology.
> Since Nikola launched its first fuel-cell semi-truck, you have seen the world rally
> behind hydrogen and follow our lead. What was once considered the fuel of the
> future is now accepted as today's solution," said Nikola's Founder and Executive
> Chairman Trevor Milton. "With our Nikola IVECO joint venture and over $10
> billion in pre-order reservations, Nikola is positioned to be a wonderful story of
> how one company can literally change the world."

### June 6, 2020 Tweet

118.    On June 6, 2020, Defendant Milton published a tweet explaining the Company's

purported in-house abilities, stating: "***All the technology, software, controls, E axle, inverters etc***

***we do internally.*** We joint venture with those that know the supply chain and manufacturing like

Iveco. ***We outsource autonomy. We outsource hardware production.***" (Emphasis added.)

### July 1, 2020 Tweet

119.    On July 1, 2020, Defendant Milton published another tweet boasting Nikola's "in

house" capacity, stating:

> We don't make the cells. We make the entire pack like the top guys do. We do have
> an OEM making our truck but ***all internals are Nikola's IP; batteries, inverters,***

---

[13] Defendant Milton recently deleted his twitter account or otherwise made it inaccessible to the public. The
tweets set forth herein are a matter of public record.

> ***software, ota, infotainment, controls, etc. We own it all in house. Just not the plant to build the truck***

(Emphasis added.)

### July 5, 2020 Tweet

120.   Defendant Milton continued to tweet about Nikola's supposed in house capabilities, specifying on July 5, 2020: "I'm talking about stuff that has no value; cabs, windows, seats or seat belts or ac units. All major components are done in house; batteries, inverters, software, controls, infotainment, over the air, etc, you don't care about the truth you're just out to be a keyboard warrior."

### July 15, 2020 Tweet

121.   Defendant Milton continued to promote the Company's purported technology and capabilities in his twitter posts. On July 15, 2020, Defendant Milton posted a supposed test run of the Nikola Two truck. Along with the video footage, Defendant Milton published the following tweets describing the video and promising future professional footage:

> 0-60 in under 5 seconds in the #nikolatwo hydrogen semi truck. Damn that was fast! ***Edited / professional content coming soon for everyone but here's my raw cell phone behind the scene.***
>
> ***Yeah, we'll be posting Go Pro video that's being edited, etc . Be up soon*** showing 0-60 camera time, outside view and also side by side against a diesel truck. This is just a teaser shot
>
> ***Actually around 5 seconds. That's 10 seconds to hit 60 and slow down. Around that time, exact timing to be shown in the edited videos coming out next month.*** Side by side diesel comparison, etc.

(Emphasis added.)

### July 17, 2020 Prospectus

122.    On July 17, 2020, the Company filed a prospectus with the SEC on Form 424B3

(the "July 17, 2020 Prospectus"). The July 17, 2020 touted the Company's unique product

offerings, stating in relevant part:

> We are a vertically integrated zero-emissions transportation solution provider that designs and manufactures state-of-the-art battery-electric and hydrogen fuel cell electric vehicles, electric vehicle drivetrains, energy storage systems, and hydrogen fueling stations. Our core product offering is centered around our battery-electric vehicle ("BEV") and hydrogen fuel cell electric vehicle ("FCEV") Class 8 semi-trucks. ***The key differentiator of our business model is our planned network of hydrogen fueling stations. We are offering a revolutionary bundled lease model, which provides customers with the FCEV truck, hydrogen fuel, and maintenance for a fixed price per mile, locks in fuel demand and significantly de-risks infrastructure development***.

(Emphasis added.)

123.    The July 17, 2020 Prospectus boasted of the Company's Truck, Energy, and

Powersports business units, stating that:

> The Truck business unit is developing and commercializing battery-electric vehicle ("BEV") and hydrogen fuel cell electric vehicle ("FCEV") class 8 trucks that provide environmentally friendly, cost-effective solutions to the short haul and long-haul trucking sector. The Energy business unit is developing and constructing a network of hydrogen fueling stations to meet hydrogen fuel demand for FCEV customers. The Powersports business unit is developing electric vehicle solutions for military and outdoor recreational applications.

124.    The July 17, 2020 Prospectus, under a section titled, "Who We Are," described

Nikola's business and prospects in relevant part:

> Nikola's vision is to be the zero-emissions transportation industry leader. We plan to realize this vision through world-class partnerships, groundbreaking R&D, and a revolutionary business model.
>
> * * *
>
> We believe our station network will provide a competitive advantage and help accelerate the adoption of our FCEVs. We believe our product portfolio and hydrogen fueling network provides a key strategic advantage that differentiates Nikola from competitors and will allow us to disrupt the estimated $600 billion global heavy-duty commercial vehicle and the related fueling and maintenance ecosystems.

125.    Further, the July 17, 2020 Prospectus discussed and described Nikola's "total addressable market," stating in relevant part that, "[g]lobally, the total addressable market ("TAM"), is estimated to be a $600 billion per-year with steady growth expected to continue as e-commerce and global economic growth fuel the need for more heavy-duty trucks." The July 17, 2020 also maintained that "Nikola's unique bundled lease which included the FCEV truck, fuel, and maintenance, will allow us to expand our total addressable market significantly when compared to traditional OEMs."

126.    The July 17, 2020 Prospectus touted Nikola's seemingly solid market positioning, stating in relevant part:

> As the commercial transportation sector transitions towards zero-emission solutions, we believe there will be a need to offer tailored solutions that meet the needs of each customer. Unlike the passenger vehicle market, where users typically return home each day, the commercial vehicle market contains multiple use cases often requiring vehicles to be out on the road for days, or weeks at a time. By offering both BEVs (for short-haul) and FCEVs (for medium- and long-haul), we believe Nikola is uniquely positioned to disrupt the commercial transportation sector by providing solutions that address the full range of customer needs.

127.    The July 17, 2020 Prospectus also described Company's product offerings and proprietary technologies in relevant part as follows:

> We have developed an extensive portfolio of proprietary technologies that are embedded and integrated in our highly specialized BEV and FCEV zero-emission vehicles. In addition, we plan to leverage our zero-emission powertrain expertise to address transportation adjacencies as exemplified with our Powersports product offerings.
>
> * * *
>
> Our management team is primarily focused on the core semi-truck and hydrogen station programs. However, we believe that we can leverage our zero-emission powertrain expertise to address transportation adjacencies. Our Powersports product offerings provide significant benefits to our core semi-truck and hydrogen station programs, including branding halo, driving awareness of Nikola and our industry-defining technology, and R&D synergies on electric drivetrain, battery technology, and other core components.

\* \* \*

Nikola's bundled lease includes maintenance for its vehicles. Service and maintenance of an electric vehicle is expected to be lower than the traditional ICE vehicle which has been proven in the electric passenger vehicle market. Fewer parts and considerably reduced complexity of the key drivetrain components should result in fewer breakdowns and less preventive maintenance, leading to better uptime and lower maintenance cost to operators. Reduced downtime could also lead to increased revenue for fleets as asset productivity increases.

128.    Additionally, the July 17, 2020 Prospectus outlined the Company's plans and expectations regarding its vehicles, services, and maintenance infrastructure, stating in relevant part:

In addition to building heavy-duty zero-emission trucks, Nikola is also developing fueling and charging stations in North America and Europe to support our FCEV fleet customers and to help capture first mover advantage with respect to next generation fueling infrastructure. Over the next 8 to 10 years, Nikola intends to collaborate with strategic partners to build up to 700 fueling and charging stations in North America and approximately 70 fueling and charging stations in Europe.

\* \* \*

A key requirement for our fleet customers is knowing there is an available service infrastructure for the maintenance and repair of our vehicles. Nikola is building a strong network of providers, a robust preventive maintenance program, as well as several levels of service depending on the complexity and type of maintenance required.

Nikola's plans with respect to the service and maintenance of its vehicles is expected to include the following:

- Electric vehicles have a system of sensors and controls that allow for precise monitoring of the vehicle and component operation performance. We will use this data to provide smart predictive maintenance, which will decrease downtime and costs by identifying a potential problem before it results in a breakdown.

- Nikola will have the ability to provide over the air updates and software fixes when the vehicle is stopped. This can significantly reduce the time for repair and improve uptime.

- In cases where a customer has their own maintenance infrastructure, we will identify and provide procedures for items that can be maintained at their

shops. This could include procedures such as tire changes, wiper and windshield repair and brake servicing.

- In cases where the customer does not have a maintenance infrastructure or for more complex items, Nikola is leveraging its exclusive partner Thompson Caterpillar for maintenance and warranty work. Customers will have access to an already established network of 800 service stations as well as the ability to deploy a mobile service model. We will also support our partners with technologies like augmented reality and web-enabled video to support technicians for very complex tasks or newly identified issues.

- If a vehicle requires maintenance of a complex system such as the fuel cell or battery, some of those items can be swapped or replaced with relative ease. This allows us to repair the downed component in the background and minimize vehicle downtime. We are also planning to develop a network of trained technicians that can travel to a customer or service partner site as necessary.

129.    Lastly, the July 17, 2020 Prospectus outlined the Company's partnership philosophy as follows:

Nikola's vision will be realized through a revolutionary business model, groundbreaking R&D, disciplined execution, and world-class partnerships. Our business model is validated and supported by world-class strategic partnerships that significantly reduce execution risk, improve commercialization timeline, and provide a long-term competitive advantage. These world-class partners have accelerated our internal development, growth, and learning and have positioned us to revolutionize the transportation sector. We believe our partnerships help increase the depth and breadth of our competitive advantage as well.

Our partnership philosophy is a recognition that the world's toughest challenges require bold solutions and a collaborative effort from multiple parties. Our goal is to provide zero-emission solutions to the transportation sector and to usher in next-generation grid solutions. With the help of our partners, we believe our chances of success are greatly improved. At Nikola, we are inspired by the knowledge that if we are successful, the whole world wins.

### July 22, 2020 Tweet

130.    On July 22, 2020, Defendant Milton published tweets announcing that Nikola's Tre model trucks were currently coming off the assembly line, stating that:

We break ground on our factory tomorrow. ***We have 5 units coming off assembly line now in Ulm Germany.*** We will be first to market with 300+ mile BEV. Say something nice, do your research or don't comment. [Emoji omitted.]

> We are breaking ground on our factory tomorrow bud. *5 Units coming off assembly lines in Germany for testing* and we'll be first to market with a 300+ mile BEV. At least be objective. Give props when due.

(Emphasis added.)

### July 27, 2020 Prospectus

131.    On July 27, 2020, the Company filed another prospectus with the SEC on Form 424B3, which contained substantially the same statements outlined above from the July 17, 2020 Prospectus.

### August 4, 2020 Form 10-Q and Earnings Call

132.    On August 4, 2020, the Company filed its quarterly report on Form 10-Q with the SEC for its second fiscal quarter ended June 30, 2020 (the "2Q20 10-Q"), signed by Defendants Russell and Brady.   The 2Q20 10-Q flaunted Defendant Milton's value and capabilities, and described the following as a risk factor of the Company:

> *We are highly dependent on the services of Trevor R. Milton, our Executive Chairman.*
>
> We are highly dependent on the services of Trevor R. Milton, our Executive Chairman, and largest stockholder. *Mr. Milton is the source of many, if not most, of the ideas and execution driving Nikola.* If Mr. Milton were to discontinue his service to us due to death, disability or any other reason, we would be significantly disadvantaged.

(Emphasis added.)

133.    The 2Q20 10-Q provided an overview of the Company and its purported hydrogen fuel abilities, stating in relevant part:

> We are a vertically integrated zero emissions transportation systems provider that designs and manufactures state of the art battery electric and hydrogen electric vehicles, electric vehicle drivetrains, energy storage systems, and hydrogen fueling stations. To date, we have been primarily focused on delivering zero emission Class 8 trucks to the commercial transportation sector in the U.S. and in Europe. Our core product offering includes battery electric and hydrogen fuel cell electric trucks and hydrogen fuel.

We operate in three business units: Truck, Energy and Powersports. The Truck business unit is developing and commercializing BEV and FCEV Class 8 trucks that provide environmentally friendly, cost effective solutions to the short haul and long haul trucking sector. The Energy business unit is developing and constructing a network of hydrogen fueling stations to meet hydrogen fuel demand for our FCEV customers. The Powersports business unit is developing electric vehicle solutions for military and outdoor recreational applications.

134.   With respect to Nikola's disclosure controls and procedures, the 2Q20 10-Q maintained:

We maintain a system of disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934 (the "Exchange Act") designed to ensure that the information required to be disclosed by us in the reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the rules and forms of the Securities and Exchange Commission, and is accumulated and communicated to our management, including our Chief Executive Officer (our principal executive officer) and Chief Financial Officer (our principal financial officer), as appropriate, to allow timely decisions regarding required disclosure.

Our management, with the participation of our Chief Executive Officer and our Chief Financial Officer, has evaluated the effectiveness of our disclosure controls and procedures under the Exchange Act as of June 30, 2020, the end of the period covered by this Quarterly Report on Form 10-Q. Based on such evaluation, our Chief Executive Officer and our Chief Financial Officer have concluded that, as of such date, our disclosure controls and procedures were effective.

* * *

There were no changes in our internal control over financial reporting, as identified in connection with the evaluation required by Rule 13a-15(d) and Rule 15d-15(d) of the Exchange Act, that occurred during the three months ended June 30, 2020 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

135.   Attached to the 2Q20 10-Q were SOX certifications signed by Defendants Russell and Brady attesting to the accuracy of the 2Q20 10-Q.

136.    The Company also hosted an earnings call for analysts and investors on August 4, 2020. During the call, Defendant Russell touted Nikola's business operations and prospects, stating in relevant part:

> Nikola is a vertically integrated zero emissions transportation systems provider. We design and manufacture battery electric and hydrogen fuel cell electric vehicles along with the battery charging systems and hydrogen fueling stations to power them. Our core global offering centers on heavy commercial trucks. Our long haul commercial transport solution is especially unique with a revolutionary bundled lease or freight-as-a-service model. We provide customers with a fuel cell electric truck, the hydrogen fuel it needs and the all scheduled maintenance for a fixed total cost.
>
> All the customer needs to provide is a driver. This approach has proven very attractive and many customers are finding that they will be able to transition to zero emissions without an increase in total cost compared to their current fossil fuel solution. Our fuel cell electric truck reservation book exceeded 14,000 units or approximately $10 billion in potential revenue sometime ago.
>
> Since then we focused our efforts on direct partnerships with customers, who have dedicated routes rolling out our hydrogen station network along corporate customers dedicated routes or milk runs allows us to guarantee a high degree of hydrogen station utilization and avoid speculative investments in fueling infrastructure. Stations are being developed based on known customer demand along established dedicated routes.

137.    In response to a question regarding Nikola's future business offerings encompassing more than trucking and fuel stations, Defendant Russell teased:

> Well . . . *you have to trust us*, as there's a lot more going on than you see in the announcements. As you know, we're talking to lots of folks. We were talking to lots of folks before, but now this seems like just about everybody in the world knows about us. We're having lots of conversations with lots of people. And when we are able to announce those publicly, we're going to do it just as Kim said. A lot of the people we're talking to would like to keep those conversations confidential for now.
>
> And so that's one of the reasons we don't announce everything that we have going on. But when we have something that we can publicly announce and you're going to hear about it. I will make one additional to Kim's point before. ***There's going to be a lot of cool things in Nikola world.*** You want, you want to be there? We won't wait. If we have something that's material, of course, we're going to announce it.

> We're required to do that. But there's going to be a lot of cool stuff that happens in Nikola world. That's going to be a place.

(Emphasis added.)

138.     In response to a question concerning the grid and the part hydrogen would play in addressing the demand in the energy market, Defendant Russell stated:

> One of the great benefits of what Nikola is bringing to the world is the ability to balance the renewable energy that's coming into the grid.
>
> * * *
>
> So one of the great things that Nikola offers to the world is when we put these hydrogen stations in and we start to get a lot of them in there, it represents a tremendous amount of demand for electricity that can match up to the supply. So we can make a – we can make hydrogen when the electricity is available and then we don't have to add significant demand to the peak.
>
> * * *
>
> And so you got this mismatch between the peak of renewable production, if the wind happens to be blowing optimally around noon, and the sun always shines optimally at noon, then you've got way too much power at that point. And then but sometime around between four o'clock and seven o'clock you don't have enough. Well, guess what, when Nicola is there in bulk, which we're going to be in volume. We can take a lot of that extra power at the peak and turn it into hydrogen. And then we don't have to be pulling power when the rest of the grid needs it so badly at the peak of demand.

### *August 10, 2020 Press Release*

139.     On August 10, 2020, the Company issued a press release announcing a "Landmark Order of 2,500 Battery-Electric Waste Trucks from Republic Services."  The press release stated, in relevant part:

> "Nikola specializes in heavy-duty, zero-emission Class 8 trucks. The refuse market is one of the most stable markets in the industry and provides long-term shareholder value," said Nikola Founder and Executive Chairman Trevor Milton. "The Nikola Tre powertrain is ideal for the refuse market as it shares and uses the same batteries, controls, inverters and e-axle. By sharing the Tre platform, we can drive the cost down for both programs by using the same parts. You couldn't pick a better partner than Republic Services, a leader in long-term environmental sustainability and customer service. Republic Services will help us ensure the Nikola Tre meets customer and fleet lifecycle demands and we are excited to have them participate in the design process."

49

140.   The press release further quoted Defendant Russell, who touted the significance of the large order, stating, "[t]his is a game changer," and explaining that "[r]efuse truck customers have always ordered chassis from truck OEMs and bodies from other suppliers. Nikola has fully integrated the chassis and body, covering both with a single factory warranty. Trucks will include both automated side loaders and front-end loaders — all of which will be zero-emission."

### August 13, 2020 Tweet

141.   On August 13, 2020, Defendant Milton published a tweet claiming that "[w]e currently make our own green H2 for under $4 / kg. We are open to others down the road but we have our stations going up and need to focus on completing ours first. Then we can work with others as we expand."

### September 8, 2020 Press Release

142.   On September 8, 2020, the Company issued a press release announcing a strategic partnership between Nikola and GM.  The press release stated, in relevant part:

> "Nikola is one of the most innovative companies in the world. General Motors is one of the top engineering and manufacturing companies in the world. You couldn't dream of a better partnership than this," said Nikola Founder and Executive Chairman Trevor Milton. "By joining together, we get access to their validated parts for all of our programs, General Motors' Ultium battery technology and a multi-billion dollar fuel cell program ready for production. Nikola immediately gets decades of supplier and manufacturing knowledge, validated and tested production ready EV propulsion, world-class engineering and investor confidence. Most importantly, General Motors has a vested interest to see Nikola succeed. We made three promises to our stakeholders and have now fulfilled two out of three promises ahead of schedule. What an exciting announcement."

143.   The statements referenced above in ¶¶97-104, 116-142 were materially false and misleading because they failed to disclose, *inter alia*, that: (1) the Company failed to adequately conduct due diligence prior to executing the merger with Nikola Motor; (2) the Company exaggerated and obscured the background and expertise of its primary employees; (3) the

Company overstated Nikola's hydrogen production and "in-house" capabilities, such as its capacity to design, manufacture, and test its products; (4) consequently, Nikola overplayed its ability to reduce the cost of hydrogen fuel; (5) Defendant Milton, continually personally exaggerated the Company's business operations and prospects, including by tweeting deceptive video footage of Nikola's "test" run of its Nikola Two truck; (6) contrary to Defendant Milton's representations, the Company did not in fact have five Tre trucks "coming off the assembly line right now"; (7) the aforementioned misrepresentations painted a false image of the Company which artificially inflated Nikola's stock price and subjected the Company to predictably heightened regulatory scrutiny and exposure; and (8) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading.

## The Truth Begins to Emerge

144.    On September 10, 2020, Hindenburg released the Hindenburg Report. The Hindenburg Report maintained that "Nikola is an intricate fraud built on dozens of lies over the course of its Founder and Executive Chairman Trevor Milton's career." The Hindenburg Report asserted that Hindenburg had "gathered extensive evidence—including recorded phone calls, text messages, private emails and behind-the-scenes photographs—detailing dozens of false statements by [Defendant Milton]." The Hindenburg Report questioned several claims made by Nikola and/or Defendant Milton from before the beginning of the Relevant Period, and revealed, *inter alia*, that despite assertions that Nikola manufactures and designs the components of its products "in house" Nikola actually obtains these components from third parties via licensing or purchases; the Company has no hydrogen production; the video footage published by Defendant Milton on his twitter account in July 2020 of the Nikola Two was staged; the Company lacked qualified

51

employees, including Defendant Milton, whose own background had been overplayed; and the five Tre trucks that were supposedly coming off production lines, were not complete.

145.   According to the Hindenburg Report, claims that the Company designed, manufactured, and tested products "in house" were significantly overstated, stating in relevant part:

> Trevor claims Nikola designs all key components in house, but ***they appear to simply be buying or licensing them from third-parties. One example: we found that Nikola actually buys inverters from a company called Cascadia. In a video showing off its "in-house" inverters, Nikola concealed the Cascadia label with a piece of masking tape.***
>
> * * *
>
> ***Despite regularly claiming to develop almost everything in-house, Nikola quietly outsourced the NZT redesign to a small company called Stellar Strategy LLC*** (https://stellarstrategyllc.com/). Stellar is staffed by former executives of Polaris (https://offroad.polaris.com/en-us/), a well-known producer of off-road vehicles who had advised Nikola on the open cabin version.

(Emphasis added.)

146.   The Hindenburg Report pointed out that skepticism over Nikola's purported in-house capabilities was not new to Defendant Milton, stating, "[a]fter the critical Bloomberg article (https://www.bloomberg.com/news/articles/2020-06-17/nikola-s-founder-exaggerated-the-capability-of-hisdebut-truck), it seemed there was an undercurrent of skepticism that Trevor became obsessed with countering[]" and that:

> Nikola had always made claims that its components were developed inhouse, dating back to Nikola's first press release (https://nikolamotor.com/press_releases/nikola-motor-company-formed-to-transform-u-s-transportation-industry-25) on May 9, 2016:
>
> "The **majority** of the semi-trucks components **are being developed by Nikola**."
>
> * * *

When people would ask skeptically what Nikola had ever actually developed, Trevor would respond with a list of components such as batteries and inverters made in-house.

147.    The Hindenburg Report detailed tweets by Defendant Milton and videos posted online by him to respond to challenges that the Company's inverters were designed in house. One video, posted on July 14th, 2020, Defendant Milton stated:

> "We do all the e-axle design in house. All the gears, the gear reductions. The thermal the cooling. Even the controls that go with it. **And, also, the inverters as well. All inverters on the Nikola truck are probably some of the most advanced software systems that I know of anywhere in the automotive world.** Why do I know that? It's because other OEMs are asking us to use it."

148.    Yet, in the same video, a piece of masking tape can clearly be seen covering the label on the inverter component, which Hindenburg stated belonged to a small company in Portland called Cascadia Motion. The Hindenburg Report further confirmed with an engineer for Cascadia Motion that those specific components were sold to the public and maintained that, "[t]his follows the same pattern. Nikola has regularly used off-the-shelf products from third parties, while claiming to have vast internal proprietary technology and to "design" all the products itself. It then partners with companies that actually have the components Nikola claimed to have already developed internally."

149.    The Hindenburg Report further asserted that the Company also exaggerated its capacity to produce hydrogen and to cut down the cost of hydrogen fuel, stating in relevant part:

> *A spokesman for Volvo spin-off Powercell AB, a hydrogen fuel cell technology company that formerly partnered with Nikola, called Nikola's battery and hydrogen fuel cell claims "hot air".* . . .

> Inexpensive hydrogen is fundamental to the success of Nikola's business model. Trevor has claimed in a presentation to hundreds of people and in multiple interviews to have succeeded at cutting the cost of hydrogen by ~81% compared to peers and to *already be producing hydrogen*. **Nikola has not produced hydrogen at this price or at any price** as he later admitted when pressed by media.

> Trevor has appointed his brother, Travis, as "Director of Hydrogen Production/Infrastructure" to oversee this critical part of the business. Travis's prior experience looks to have largely consisted of pouring concrete driveways and doing subcontractor work on home renovations in Hawaii.

(Emphasis added.)

150.    The Hindenburg Report quoted multiple interviews with Defendant Milton in 2020, where Defendant Milton claims that Nikola has brought the cost of hydrogen down to below $3-$4/kg. In one such interview, Defendant Milton admitted that "Nikola's entire answer to bringing down the cost [of hydrogen] was to simply standardize a hydrogen station" and further acknowledged that the Company did not produce any hydrogen at all.

151.    According to the Hindenburg Report, the Company's key employees were not as qualified as Nikola set them out to be. For example, as noted above the Director of Hydrogen Production/Infrastructure is Defendant Milton's younger brother, whose only experience related to paving driveways in Hawaii. The Company's Head of Infrastructure Development of the 700+ hydrogen stations Nikola plans to make is a former CEO of a golf club. The Hindenburg Report questioned these and other qualifications of Nikola's leadership, stating in relevant part:

> **Trevor: "We've Assembled One of the Best Teams in the World" Nikola's Chief Engineer: A Background Largely in Software Development and Pinball Machine Repair**
>
> Trevor regularly touts bringing in top talent (https://youtu.be/ol110JwBQAA?t=33) from all over the world. Key to that team is Nikola's Chief Engineer, Kevin Lynk (https://www.linkedin.com/in/klynk/).
>
> Trevor credits Kevin with designing all of the company's e-axle, a complex task for one vehicle let alone Nikola's proposed suite of vehicles. . . .We reviewed Kevin's biography on LinkedIn and found that prior to Nikola, he worked for 7 months designing oilfield products using CAD software, 3.5 years in software development, and prior to that spent 9 months repairing pinball machines.

152.    The Hindenburg Report further maintained that the July 2020 video footage of the Nikola Two posted by Defendant Milton, claiming that the truck went "0-60 in Under 5 Seconds"

was actually "Already Rolling When the Video Started and it Still Took Over 10 Seconds" and was misleading, at best. The Hindenburg Report pointed out that although one was promised, no professional video followed the video post.

153.    The Hindenburg Report tracked Defendant Milton's questionable history of launching and leaving business ventures that leveraged the work and ideas of others and unsuccessfully attempted to sell an image of innovation and progress, stating in relevant part:

**. . . Trevor Milton's Career Path Leading Up to Nikola November 2009: Trevor Milton Launches dHybrid, Inc. with a Partner, Kicking off his EV Trucking Journey. It Ended in Litigation With Allegations of Misappropriation and False Promises**

After dropping out of college [], Trevor Milton started an alarm sales company in Utah called St. George Security and Alarm. He eventually exited the business for $300,000. Our interview with its buyer indicated that Trevor overpromised, resulting in a total loss for the initial acquirer. We also interviewed Trevor's "50/50" business partner who indicated he was led to believe the exit was much smaller, saying he ultimately received only $100,000 for his "50%". Following the alarm business exit, Trevor launched an online classified ads website that sold used cars, called uPillar.com, which eventually failed. (For more on both of these early businesses, see the
Appendix at the end of this report.)

Following those two early pursuits, Trevor's initial foray into alternative energy vehicles was a company called dHybrid, Inc. Trevor joined forces with an engineer named Mike Shrout who had developed compressed natural gas (CNG) conversion technology for diesel engines. Shrout was to bring the technical expertise to the venture while Trevor would bring his business experience.

**It Got Off to a Good Start: dHybrid Entered into Agreement with Major Trucking Company Swift to Convert Up to 800 Trucks, a Contract Valued at 16 Million**

* * *

**Swift Later Sued, Alleging the Company Delivered Only 5 Trucks That Didn't Work and That dHybrid's Officers Misappropriated Capital for Personal Use**

* * *

**In the Lead-Up to the Lawsuit, Trevor Reached out to New Investors Claiming the Swift Contract Was Worth 250-300 Million Reality: We Have the Contract. It Was Only 16 Million**

* * *

**Following the Swift Litigation, dHybrid Sought a Buyout But the Deal Ended in More Litigation, With the Buyer Alleging dHybrid Made Numerous Misrepresentations About its Capabilities**

* * *

**2012: With dHybrid Mired in Litigation, Trevor Started a New Company With his Dad, Choosing a Very Similar Name, dHybrid Systems**

**Trevor Then Falsely Claimed to Prospective Partners That 'dHybrid' Had Been in Operation for Years**

* * *

**2014: dHybrid *Systems* Was Then Acquired by Worthington—A Successful Exit…For Trevor**

**We Learned from a Former Employee (In a Recorded Call) That dHybrid Concealed Potentially Fatal Product Issues from Worthington In Order to Get the Deal Done**

154.   The Hindenburg Report further alleged that Nikola did not have five Tre trucks from Ulm, Germany coming off the production line, as those trucks were not completed according to Hindenburg's sources.

155.   On this news, the price per share of Nikola common stock fell $10.24 per share over the next two trading days, or 24%, from closing at $42.37 per share on September 9, 2020, to close at $32.13 per share on September 11, 2020.

156.   On September 14, 2020, the Company issued a press release rejecting the claims presented in the Hindenburg Report in order to "set[] the record straight[.]" The same day, *Bloomberg* published an article titled, "SEC Examining Nikola Over Short Seller's Fraud Allegations," disclosing that the SEC was investigating the claims made in the Hindenburg Report.

157.   The next day, on September 15, 2020, the *Wall Street Journal* published an article titled, "Justice Department Probes Electric – Truck Startup Nikola Over Claims It Misled Investors," announcing that the DOJ was joining the SEC in investigating Nikola over fraud allegations lodged against Nikola in the Hindenburg Report.

158.    Also on September 15, 2020, Hindenburg published the Hindenburg Report II, asserting that "Nikola Failed to Address 43 of our 53 Questions. Of Those It Touched On, It Largely Confirmed Our Findings or Raised New Questions[.]" The Hindenburg Report II further critiqued Nikola's purported response to claims that the Company designed and manufactured its components in house, stating in relevant part:

> **Our Report: Trevor Claimed On Video That Nikola's Inverters Were Developed In House And That OEMs Were Asking To Use Them. In The Same Video He Is Showcasing An Inverter Manufactured By Cascadia With Masking Tape Covering Its Label.**
>
> **Nikola's Response: Admits This is True, Then Deflects by Vaguely Stating That the Company Has Been "Working on Its Own Inverters For Quite Some Time"**
>
> * * *
>
> *The company once again admitted the claims in our report to be true, and walked back its claims that these inverters were Nikola's proprietary intellectual property by vaguely stating that it is "working on" its own inverter:* "Nikola has been designing, engineering and working on its own inverters for quite some time."

159.    The Hindenburg Report II also pointed out Defendant Russell's shift in his description of the Company in a recent interview with the Financial Times, stating in relevant part:

> *The company's CEO, Mark Russell, further walked back the company's claims to have vast proprietary technology when pressed by reporters from the Financial Times on Friday:*
>
> "Asked about Mr. Milton's claim to have all the 'core' technology for its vehicles, Mr. Russell **described the company as an 'integrator', stitching together the many elements of its vehicles from a complex supply chain.**"
>
> *Russell's admission clearly corroborates our own findings, and directly contradicts Trevor's repeated claims of Nikola having vast proprietary intellectual property.*
>
> The company's response on Monday morning declared that "at no time did Nikola state that the inverter on the prototype truck shown in the video was the Company's." But of course it ignores the fact that there is video proof, narrated by Milton himself[.]

(Emphasis added.)

160.    As the Hindenburg Report II pointed out, the Company's retort to its hydrogen production claims and its employees' experience fared no better, stating in relevant part:

**Nikola's Response Confirmed That None of this Happened: "Nikola Continues to Believe that its Planned Hydrogen Station Network…Will Provide Key Competitive Advantages."**

* * *

*As acknowledged by the company's statement Monday, it has no hydrogen network, and simply hopes to have one in the future.* This once again strikes us as a tacit admission of securities fraud.

* * *

In our report, we noted that Trevor Milton appointed his younger brother Travis to a position that required scientific expertise. . . .

The company responded on Monday by claiming that Travis is qualified for this high-level scientific position because he previously worked in construction:

"Travis Milton previously owned and operated his own construction company preparing him for hydrogen station infrastructure and buildouts."

(Emphasis added.)

161.    The Hindenburg Report II stated that the Company's admission that "five trucks are currently being built and commissioned in Ulm, Germany and are pre-production builds" confirmed the Hindenburg Report's assertions that Defendant Milton's claims in July 2020 were false.

162.    On this news, the price per share of Nikola common stock fell another $0.17 per share over the course of the trading day, or 8.27%, from opening at $33.00 per share on September 15, 2020, to close at $32.83 per share the same day.

163.    On September 21, 2020, the Company issued a press release and filed a current report with the SEC on Form 8-K announcing the voluntary resignation of Defendant Milton from the Company and its Board. Pursuant to Defendant Milton's separation agreement, the Company agreed to the following:

the Company agrees to (i) vest and settle, at a time selected by the Company but no later than March 15, 2021, in accordance with applicable documentation the restricted stock units (the "RSUs") granted to the Executive on August 21, 2020, (ii) comply with all indemnification and advancement of expenses obligations it has pursuant to the Company's certificate of incorporation and bylaws, each as amended through the date hereof, the Employment Arrangement, and the Indemnification Agreement, dated as of June 3, 2020, by and between the Company and the Executive (the "Indemnification Agreement"), (iii) pay for the reasonable costs of a security inspection of the Executive's residence, (iv) reimburse the Executive up to $100,000 in the aggregate for a full-time security detail for the Executive and his family for three months following the Effective Date, (v) reimburse the Executive in accordance with applicable Company policy for business expenses incurred on or before the Effective Date, and (vi) reimburse the Executive for his reasonable legal fees incurred in connection with the negotiation and drafting of this Agreement.

164.   Defendant Milton, in addition to agreeing to forego certain benefits provided under his prior employment agreement, agreed, *inter alia*, to "not make any defamatory or disparaging statements about the Company, its board of directors, officers, management, practices, procedures, or business operations"; "promptly revise the Executive's employment status on social media, including LinkedIn and other social media sites so that the Executive is no longer identified as holding any position with the Company"; and to not "sue the Company, its subsidiaries, parents, or affiliated corporations . . . directors, officers, stockholders, partners, representatives," etc. The Company also agreed:

> on its own behalf and on behalf of its divisions, subsidiaries, parents, or affiliated corporations, past and present, and each of them, as well as each of its and their assignees, predecessors, successors, directors, officers, stockholders, partners, representatives, insurers, attorneys, agents or employees, past or present, or any of them (individually and collectively), hereby releases the Executive from and with respect to any and all claims, agreements, obligations, demands and causes of action, known or unknown, suspected or unsuspected, arising out of or in any way connected with events, acts, conduct, or omissions occurring at any time prior to and including the date Company signs this Agreement; provided, however, that such release shall not include claims for fraud, securities laws violations[.]"

165.    The Company's common stock fell further upon this news, from closing at $34.19 per share on September 18, 2020 to close at $27.58 per share on September 21, 2020, a drop of $6.61 per share, or nearly 20%.

166.    On September 21, 2020, Defendant Milton seemingly deleted his twitter account, with some news outlets claiming he did so due to unrelated allegations of sexual assault from a family member.[14]

## DAMAGES TO NIKOLA

167.    As a direct and proximate result of the Individual Defendants' conduct, Nikola has lost and will continue to lose and expend many millions of dollars.

168.    Such expenditures include, but are not limited to, legal fees associated with the Securities Class Actions filed against the Company, its CEO, its CFO, and its former Executive Chairman, and/or its former CEO and its former CFO, and any related investigations, including the SEC and DOJ investigations into the Company, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

169.    As a direct and proximate result of the Individual Defendants' conduct, Nikola has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

170.    Plaintiff brings this action derivatively and for the benefit of Nikola to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their

---

[14] https://jalopnik.com/sexual-assault-accusations-drive-ex-nikola-ceo-to-delet-1845145778. Last visited September 22, 2020.

fiduciary duties as directors and/or officers of Nikola, unjust enrichment, abuse of control, gross mismanagement, and violations of Section 14(a) of the Exchange Act, as well as the aiding and abetting thereof.

171.   Nikola is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

172.   Plaintiff is, and has been at all relevant times, a shareholder of Nikola. Plaintiff will adequately and fairly represent the interests of Nikola in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

173.   Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

174.   A pre-suit demand on the Board of Nikola is futile and, therefore, excused. At the time of filing of this action, the Board consists of the following eight individuals: Defendants Russell, Girsky, Jin, Mansuetti, Marx, Stalberg, Thompson, and Ubben (the "Directors"). Plaintiff needs only to allege demand futility as to four of the eight Directors who are on the Board at the time this action is commenced.

175.   Demand is excused as to all of the Directors because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material facts, while one of them engaged in lucrative insider sales, which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

176.    In complete abdication of their fiduciary duties, the Directors either knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. The fraudulent scheme was intended to make the Company appear more profitable and attractive to investors. As a result of the foregoing, the Directors breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

177.    Additional reasons that demand on Defendant Russell is futile follow. Defendant Russell has served as the Company's CEO since June 2020 and previously served as a director of Nikola Motor since February 2019.  He is thus a non-independent director. He receives and is entitled to handsome compensation, as discussed above.  Defendant Russell personally made or signed off on several of the false and misleading statements discussed herein, including those made in the 2Q20 10-Q, which he signed and signed a SOX certification for, the August 4, 2020 conference call, and the August 10, 2020 press release. As the Company's highest officer he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Russell is a defendant in the Securities Class Actions. For these reasons, too, Defendant Russell breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

178.    Additional reasons that demand on Defendant Girsky is futile follow. Defendant Girsky has served as a Company director since June 2020 and has served as Chairman of the Board since September 2020. He also serves as Chair of the Audit Committee and as a member of the Nominating and Corporate Governance Committee. Defendant Girsky previously served as the

CEO of VectoIQ. He receives and is entitled to handsome compensation, as discussed above. As a trusted Company director and Chair of the Audit Committee, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets.  Furthermore, Defendant Girsky is a defendant in one of the Securities Class Actions. For these reasons, too, Defendant Girsky breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

179.    Additional reasons that demand on Defendant Jin is futile follow. Defendant Jin has served as a Company director since June 2020 and previously served as a director of Nikola Motor since May 2019. She also serves as a member of the Audit Committee. She receives and is entitled to receive handsome compensation, as discussed above. As a trusted Company director and member of the Audit Committee, she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets.  For these reasons, too, Defendant Jin breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

180.    Additional reasons that demand on Defendant Mansuetti is futile follow. Defendant Mansuetti has served as a Company director since June 2020 and previously served as a director of Nikola Motor since September 2019. He also serves as a member of the Audit Committee. He receives and is entitled to receive handsome compensation, as discussed above. As a trusted Company director and member of the Audit Committee, he conducted little, if any, oversight of

the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, too, Defendant Mansuetti breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

181.    Additional reasons that demand on Defendant Marx is futile follow. Defendant Marx has served as a Company director since June 2020 and previously served as a director of Nikola Motor since September 2019. He also serves as Chair of the Compensation Committee and as a member of the Nominating and Corporate Governance Committee. He receives and is entitled to receive handsome compensation, as discussed above. As a trusted Company director he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, too, Defendant Marx breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

182.    Additional reasons that demand on Defendant Stalsberg is futile follow. Defendant Stalsberg has served as a Company director since June 2020 and previously served as a director of Nikola Motor since July 2017. He also serves as a member of the Compensation Committee. He receives and is entitled to receive handsome compensation, as discussed above. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties

to protect corporate assets.  For these reasons, too, Defendant Stalsberg breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

183.    Additional reasons that demand on Defendant Thompson is futile follow. Defendant Thompson has served as a Company director since June 2020 and previously served as a director of Nikola Motor since July 2017. He also serves as a member of the Compensation Committee.  He receives and is entitled to receive handsome compensation, as discussed above. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets.  For these reasons, too, Defendant Thompson breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

184.    Additional reasons that demand on Defendant Ubben is futile follow. Defendant Ubben has served as a Company director since June 2020 and previously served as a director of Nikola Motor since September 2019. He also serves as Chair of the Nominating and Corporate Governance Committee.  He receives and is entitled to receive handsome compensation, as discussed above.  As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets.  His insider sale, which yielded over $59.7 million in proceeds, demonstrates his motive in facilitating and participating in the fraud. For these reasons, too, Defendant Ubben breached his fiduciary duties, faces a substantial

likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

185.    Additional reasons that demand on the Board is futile follow.

186.    All of the Directors benefitted directly from the wrongdoing alleged herein, as the false and misleading statements caused the Company's stock price to be artificially inflated, thus increasing the value of Nikola stock and RSUs held by the Directors pursuant to the 2020 Plan. According to the May 2020 Proxy Statement, the Directors were all interested in the business combination between VectoIQ and Nikola Motor as they held direct or indirect ownership interest in Nikola Preferred Stock and/or Nikola Common Stock.

187.    The Directors have longstanding business and personal relationships with each other and the Individual Defendants that further preclude them from acting independently and in the best interests of the Company and the shareholders. For example, all of the Directors served as directors of Nikola Motor prior to the business combination, founded and run by the Company's former Executive Chairman Defendant Milton. Defendant Milton continues to be the Company's largest stockholder. Defendant Russell owns a business together with Defendant Milton. Moreover, the Directors are party to certain related party agreements with the Company and certain of the Individual Defendants. For example, Defendants Marx, Ubben, Mansuetti, and Jin are affiliated with entities that purchased millions of dollars' worth of Nikola Series D or C preferred stock in equity finance arrangements with the Company. During the Relevant Period, Defendant Ubben was also party to a transactional agreement with Defendant Milton, through an entity he is the managing partner of. Defendant Thompson is also the beneficiary of a service agreement from December 2016 with the Company in which his company is the exclusive distributor of certain repair services for the Company and is entitled to certain commissions for each Nikola vehicle he

sells to a third party. According to the May 2020 Proxy Statement, "New Nikola's audit committee will approve only those transactions that it determines are fair to us and in New Nikola's best interests. All of the transactions described above were entered into prior to the adoption of such policy." These conflicts of interest precluded the Directors from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' conduct. Thus, demand upon the Directors would be futile.

188.    Pursuant to the separation agreement with Defendant Milton, the Directors are all inhibited from pursuing certain claims against Defendant Milton—the primary wrongdoer against the Company. Thus, for these reasons too, the Directors are unable to approach a demand against the Individual Defendants with the requisite level of disinterestedness and demand is therefore excused.

189.    In violation of the Code of Conduct, the Directors conducted little, if any, oversight of the Company's issuance of materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement and violations of Section 14(a) of the Exchange Act. In further violation of the Code of Conduct, the Directors failed to maintain the accuracy of Company records and reports, conduct business in an honest and ethical manner, and properly report violations of the Code of Conduct. Thus, the Directors face a substantial likelihood of liability and demand is futile as to them.

190.    Defendants Girsky, Jin, and Mansuetti (the "Audit Committee Defendants") serve on the Company's Audit Committee. Pursuant to the Audit Committee Charter, Audit Committee Defendants were responsible for overseeing, *inter alia*, Nikola's accounting and financial reporting processes and internal control over financial reporting, the audit and integrity of the Company's

financial statements, and the Company's compliance with applicable law. As a result of the Audit Committee's failures of management and oversight, the Audit Committee Defendants face a substantial likelihood of liability for their breach of fiduciary duties and any demand upon them is futile.

191.    Nikola has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Directors have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Nikola any part of the damages Nikola suffered and will continue to suffer thereby. Thus, any demand upon the Directors would be futile.

192.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Directors can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

193.    The acts complained of herein constitute violations of fiduciary duties owed by Nikola's officers and directors, and these acts are incapable of ratification.

194.    The Directors may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Nikola. If there is a directors' and officers' liability

insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Directors were to sue themselves or certain of the officers of Nikola, there would be no directors' and officers' insurance protection. Accordingly, the Directors cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Directors is futile and, therefore, excused.

195.    If there is no directors' and officers' liability insurance, then the Directors will not cause Nikola to sue the Individual Defendants named herein, as, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

196.    Thus, for all of the reasons set forth above, all of the Directors, and, if not all of them, at least four of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

### Against Individual Defendants for Violations of
### Section 14(a) of the Exchange Act

197.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

198.    The Section 14(a) Exchange Act claims alleged herein are based solely on negligence. They are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants. The Section 14(a) claims alleged herein do not allege and do not sound in fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of,

or reference to any allegation of fraud, scienter, or recklessness with regard to these nonfraud claims.

199.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

200.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

201.    Under the direction and watch of the Directors, the April and May 2020 Proxy Statements failed to disclose that: (1) the Company failed to adequately conduct due diligence prior to agreeing to merge with Nikola Motor; (2) the Company exaggerated and obscured the background and expertise of its primary employees; (3) the Company overstated Nikola's hydrogen production and "in-house" capabilities, such as its capacity to design, manufacture, and test its products; (4) consequently, Nikola overplayed its ability to reduce the cost of hydrogen fuel; and (5) the Company failed to maintain internal controls.

202.    The May 2020 Proxy Statement stated, regarding the Company's Code of Conduct, that:

The New Nikola Board will adopt a Code of Business Conduct and Ethics, or the Code of Conduct, applicable to all of New Nikola's employees, executive officers and directors. The Code of Conduct will be available on New Nikola's website at *www.nikolamotor.com*. Information contained on or accessible through New Nikola's website is not a part of this proxy statement/prospectus/information statement, and the inclusion of New Nikola's website address in this proxy statement/prospectus/information statement is an inactive textual reference only. The nominating and corporate governance committee of the New Nikola Board will be responsible for overseeing the Code of Conduct and must approve any waivers of the Code of Conduct for employees, executive officers and directors. New Nikola expects that any amendments to the Code of Conduct, or any waivers of its requirements, will be disclosed on its website.

203.    The May 2020 Proxy Statement was false and misleading because, despite assertions to the contrary, its Code of Conduct was not followed, as the Individual Defendants allowed false and misleading statements to be issued to the investing public.

204.    In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the April and May 2020 Proxy Statements were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the April and/or May 2020 Proxy Statements, including but not limited to, approving the business combination proposal to approve and adopt the business combination agreement between VectoIQ and Nikola Motor, the amendment of the Company's certificate of incorporation to change its name to Nikola Corporation, among other revisions, to elect nine directors to serve on the Board, to approve and adopt the "Stock Inventive Plan Proposal" to approve the equity and incentive award plan to be effective after the business combination closed, to issue VectoIQ common stock to Nikola stockholders in connection with the business combination, to adopt and approve the employee stock purchase plan to be effective after the business combination closed, and to adjourn the special meeting to a later date to allow certain of the Individual Defendant to solicit additional votes for the foregoing proposals.

205.    The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the April and May 2020 Proxy Statements.

## SECOND CLAIM

### Against the Individual Defendants for Breach of Fiduciary Duties

206.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

207.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Nikola's business and affairs.

208.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

209.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Nikola.

210.    In breach of their fiduciary duties owed to Nikola, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose that: (1) the Company failed to adequately conduct due diligence prior to executing the merger with Nikola Motor; (2) the Company exaggerated and obscured the background and expertise of its primary employees; (3) the Company overstated Nikola's hydrogen production and "in-house" capabilities, such as its capacity to design, manufacture, and test its products; (4) consequently, Nikola overplayed its ability to reduce the cost of hydrogen fuel; (5) Defendant Milton, continually personally exaggerated the Company's business operations and prospects, including by tweeting deceptive video footage of Nikola's "test" run of its Nikola Two truck; (6) contrary to Defendant Milton's representations, the Company did not in fact have

five Tre trucks "coming off the assembly line right now"; (7) the aforementioned misrepresentations painted a false image of the Company which artificially inflated Nikola's stock price and subjected the Company to predicable heightened regulatory scrutiny and exposure; and (8) the Company failed to maintain internal controls. As a result of the foregoing, Nikola's public statements were materially false and misleading at all relevant times.

211.    The Individual Defendants also failed to correct and/or caused the Company to fail to correct the false and misleading statements and omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

212.    Also in breach of their fiduciary duties, the Individual Defendants failed to maintain internal controls, while one of the Individual Defendants profited from an improper and lucrative insider sale.

213.    The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Nikola's securities, and disguising insider transactions.

214.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent schemes set forth herein and to fail to maintain internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent schemes set forth herein, and that internal controls were not adequately

maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent schemes and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Nikola's securities, and engaging in insider transactions. The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

215.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

216.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Nikola has sustained and continues to sustain significant damages.

217.    As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

218.    Plaintiff on behalf of Nikola has no adequate remedy at law.

## THIRD CLAIM

### Against Individual Defendants for Unjust Enrichment

219.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

220.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Nikola.

221.    The Individual Defendants, based on improper conduct, received bonuses, stock options, or similar compensation from Nikola that was tied to the performance or artificially

inflated valuation of Nikola, received compensation that was unjust in light of the Individual Defendants' bad faith conduct, or received excessive compensation.

222.   Plaintiff, as a shareholder and a representative of Nikola, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

223.   Plaintiff on behalf of Nikola has no adequate remedy at law.

## FOURTH CLAIM

### Against the Individual Defendants for Abuse of Control

224.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

225.   The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Nikola, for which they are legally responsible.

226.   As a direct and proximate result of the Individual Defendants' abuse of control, Nikola has sustained significant damages.  As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, Nikola has sustained and continues to sustain significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

227.   Plaintiff on behalf of Nikola has no adequate remedy at law.

## FIFTH CLAIM

### Against the Individual Defendants for Gross Mismanagement

228.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

229.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Nikola in a manner consistent with the operations of a publicly-held corporation.

230.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Nikola has sustained and will continue to sustain significant damages.

231.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

232.    Plaintiff on behalf of Nikola has no adequate remedy at law.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of Nikola, and that Plaintiff is an adequate representative of the Company;

(b)    Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Nikola;

(c)    Determining and awarding to Nikola the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)    Directing Nikola and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Nikola and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions

for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

      1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the board;

      2. a provision to permit the shareholders of Nikola to nominate at least four candidates for election to the Board; and

      3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

      (e)      Awarding Nikola restitution from Individual Defendants, and each of them;

      (f)      Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

      (g)      Granting such other and further relief as the Court may deem just and proper.

Dated: September 23, 2020              Respectfully submitted,

Of Counsel:                       FARNAN LLP

THE BROWN LAW FIRM, P.C.      /s/ Michael J. Farnan
Timothy Brown                Brian E. Farnan (Bar No. 4089)
240 Townsend Square        Michael J. Farnan (Bar No. 5165)
Oyster Bay, NY 11771        919 N. Market St., 12th Floor
Telephone: (516) 922-5427      Wilmington, DE 19801
Facsimile: (516) 344-6204       Telephone: (302) 777-0300
Email: tbrown@thebrownlawfirm.net  Facsimile: (302) 777-0301
                                Email: bfarnan@farnanlaw.com
                                Email: mfarnan@farnanlaw.com

*Attorneys for Plaintiff*